555 A.2d 129

In re GLOSSER BROTHERS, INC.

Appeal of GLOSSER BROTHERS, INC. Appellant.

In re GLOSSER BROTHERS, INC.

Appeal of W.S. WURZBURGER, Individually, Wurzburger, Morrow and Keough, Inc., and Morton Glosser, Appellants.

Superior Court of Pennsylvania.

Argued May 5, 1988.

Filed Jan. 30, 1989.

Reargument Denied March 17, 1989.

Edward G. O'Connor, Pittsburgh, for appellant in no. 1052 and appellee in no. 92.

Before CIRILLO, President Judge, and BECK, and POPOVICH, JJ.

BECK, Judge:

This is an appeal and cross-appeal from a trial court determination of the fair value of the common stock of appellant/cross-appellee Glosser Bros., Inc. (the "Company"). The impetus for the trial court's valuation was a petition by the Company for a determination of the fair value to be paid to appellees/cross-appellants, shareholders of the Company who dissented from a management sponsored leveraged buy-out and merger of the Company pursuant to Section 515 of the Business Corporations Law. 15 Pa.Stat.Ann. § 1515 (1967 & Supp.1988).

I.  Background

The Company is a Pennsylvania corporation with its principal office and headquarters in Johnstown, Pennsylvania. It operated a chain of 24 discount department stores, 40 outlet stores, a conventional department store and a chain

of supermarkets. At the time relevant to this appeal, 2,269,000 shares of the Company's common stock were issued and outstanding. The stock was listed on the American Stock Exchange. Fifty to sixty percent (50–60%) of the stock was closely held by management and members of the Glosser family. The remainder was publicly traded. In the six months prior to the announcement of the instant transaction (the merger), the stock traded at an average rate of approximately 30,000 to 40,000 shares per month and at an average price of $14.00 per share. In the two years prior to the merger, the average monthly trading volume was slightly higher, but the average trading price was substantially the same. In the three years prior to the merger, the market price of the stock never exceeded $19.00.

On January 28, 1985, the Company announced a proposed merger whereby all of the common stock of the Company would be acquired in exchange for a cash payment to the shareholders of $20 per share. The goal of the transaction was apparently to shift control of the Company to a small management group. This group, working with the New York investment firm of Bear Stearns & Co., formed B.S. Holding Corporation, now Gee Bee Holding, which in turn formed a wholly owned subsidiary called B.S. Acquisition Corp. The latter corporation made the offer for the buy-out of the Company's stock and proposed to merge with the Company. The proposed merger was approved by the vote of a substantial majority of the shareholders at a meeting held on September 12, 1985 and the merger became effective on October 11, 1985. Thus, the net result was that B.S. Acquisition Corp. was the survivor of the merger and now owns the Company's business. B.S. Acquisition is wholly owned by Gee Bee Holding, which in turn is controlled by the former management group of the Company.

Appellees/cross-appellants are three dissenting shareholders, namely, Morton Glosser, W.S. Wurzburger and Mr. Wurzburger's wholly owned corporation, Wurzburger, Morrow & Keough, Inc. They refused to accede to the proposed merger, contending that the $20 per share price that

B.S. Acquisition offered for their stock did not represent the fair value thereof. Therefore, as required by Section 515, the Company instituted this action for an appraisal of the stock. The Company's petition named Morton Glosser as a dissenter, but did not name Mr. Wurzburger or his corporation. Mr. Wurzburger and his corporation petitioned to intervene, and their petition was granted.[1]

The trial court did not appoint an appraiser, but rather conducted a several day trial without jury consisting mainly of expert testimony regarding a variety of methods of determining the fair value of the stock. The trial court ultimately determined that the fair value of the stock should be fixed at $31.00 per share and assessed interest at the rate of eight percent (8%) from the date of the merger. The trial court arrived at this value by assigning sixty-five percent weight (65%) to what it determined to be the asset value of the stock and thirty-five percent (35%) weight to what it determined to be the investment value of the stock. The court gave no weight to the stock's market value as determined by the price at which it traded on the American Stock Exchange.

## II. Valuation Issues

The Company challenges the trial court's valuation on several grounds, only one of which we find to have merit. We will nevertheless address all of the Company's properly preserved objections to the valuation for the purpose of guiding the trial court on remand.

### A. *Scope of Review*

Initially we note that our scope of review in an appeal from a trial court determination of value under Section 515 has been clearly defined in our case law. In *In re Jones &*

---

1. One of the issues raised on appeal by the Company is the propriety of the trial court's grant of these shareholders' petition to intervene. The Company contends that these shareholders did not follow the requirements of Section 515 for perfection of a dissenter's appraisal right. The facts pertinent to this issue will be more fully set forth below.

*Laughlin Steel Corp.*, 328 Pa.Super. 442, 477 A.2d 527 (1984), we described our scope of review as follows:

> We first look to the case of *Appeal of O'Connor,* 444 Pa. 206, 283 A.2d 279 (1971) in order to determine our scope of review.... the [*O'Connor*] court stated:
>
> > Our review of this appeal encompasses only an ascertainment of whether the findings of the trial court are supported by competent and substantial evidence. We reject appellant's request that we make an independent determination as to the fair value of her shares: 'This court does not sit as a trier of issues of fact expecting to be persuaded that one or the other side is more credible. That is only a task for the trial court and we would never invade that area of the judicial process.' (Footnotes and citations omitted).
>
> *Appeal of O'Connor, supra,* 283 A.2d at 280.
>
> The *O'Connor* court further noted that substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Id.* 328 Pa.Super. at 457–58, 477 A.2d at 534–35. *See also O'Connor Appeal,* 452 Pa. 287, 304 A.2d 694 (1973); Note, *Corporations—Fair Value for Dissenting Shareholders Under the Pennsylvania Appraisal Statute,* 78 Dick.L. Rev. 582 (1974).

In recognition of our limited scope of review, we too will refrain from making an independent determination of the value of the Company's stock. Thus, although the Company's allegations of error as to valuation, particularly as stated in its post-trial motions, are at points no more than generalized attacks on the trial court's decision, we will address only those issues that were both specifically preserved in the trial court and properly presented to this court.

### B. *Relevance of Market Value*

One of the Company's strongest objections to the trial court's valuation centers on the trial court's refusal to

assign any weight to the market value of the stock. We agree that this was error.

The leading Pennsylvania case defining the methodology for valuing stock in a Section 515 proceeding is the second *O'Connor Appeal,* decided by the Supreme Court in 1973. *O'Connor Appeal,* 452 Pa. 287, 304 A.2d 694 (1973). There, the Supreme Court instructed that fair value is to be construed as going concern value, as contrasted with liquidation value. The court noted that there is a potentially endless list of factors that are considered relevant to this value. The "going concern" concept of fair value in a dissenting shareholders' appraisal proceeding and the many individual factors comprising it were aptly described by the Delaware Supreme Court in *Tri–Continental Corp. v. Battye,* Del., 74 A.2d 71, 76 (1950):

> The basic concept of value under the appraisal is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which might reasonably enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to any inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.

*Id.* at 72.

The *O'Connor* court noted that courts had properly distilled all of these factors into three principal valuation methods, i.e. (1) net asset value; (2) actual market value;

and (3) investment value. The court defined these valuation methods as follows:

*Net Asset Value* is the share which the stock represents in the value of the net assets of the corporation. Such assets include every kind of property and value, whether realty or personalty, tangible and intangible, including good will and the corporation's value as a going concern. *Investment Value* is an estimate of present worth in light of past, present and prospective financial records of the company and is obtained by capitalizing earnings. There are two basic steps in the capitalization process: calculation of a representative annual earnings figure, and choice of a capitalization ratio which reflects the stability and predictability of earnings of the particular corporation.

*Market Value* refers to the price at which the stock was selling on the market prior to the action which is objected to, disregarding any change in price due to the action.

*O'Connor,* 452 Pa. at 292–93 n. 7, 304 A.2d at 698 n. 7.

However, we do not read the *O'Connor* opinion as limiting a trial court to a consideration of only these three valuation methods. *Id.,* 452 Pa. at 291–92, 304 A.2d at 697–98. Financial analysis has become increasingly complex with the passage of time. New methods of valuing investments have been developed and are generally accepted in the financial community as being reliable. In recognition of this fact, other jurisdictions that previously restricted a trial court to the foregoing three valuation methods have now expanded the types of valuation information that may be considered in a stock valuation proceeding. For example, in *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del. 1983), the Supreme Court of Delaware, known for its expertise in these matters, directed that Delaware courts would no longer be bound to use only the traditional "Delaware block" or weighted average approach to valuation. By this method, which is still generally in use in Pennsylvania and which was applied by the trial court in the instant case, the court considers only the three traditional methods of valua-

tion, assigns each a percentage weight and adds the resulting amounts to come to a total value. The *Weinberger* court found this approach too restrictive and directed that courts henceforth use a "more liberal approach [which] must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court...." *Id.* at 712–13.

Although we do not question the reliability of the three traditional methods of valuation, we do recognize that they are not the exclusive methods to be used in determining going concern value. We approve of the *Weinberger* approach to valuation. Such a broader attitude not only comports with the *O'Connor* court's recognition that all factors relevant to value should be considered, but will also serve to assist trial courts greatly in their difficult valuation task by allowing them to consider a broader and perhaps more sophisticated range of information.

Against this backdrop, we consider the more specific question of the relevance of market value to a determination of the fair value of stock in the context of a Section 515 proceeding. The relevance of this indicia of value has been aptly described by the Court of Chancery of Delaware as follows:

It is, of course, axiomatic that if there is an established market for shares of a corporation the market value of such shares must be taken into consideration in an appraisal of their intrinsic value. And if there is no reliable established market value for the shares a reconstructed market value, if one can be made, must be given consideration. It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in the appraisal of stock.

*Application of Delaware Racing Association,* 42 Del.Ch. 406, 213 A.2d 203, 211 (1965). See also Henn, H. and Alexander, J., *Law of Corporations* § 349 at 1002–03 (3d ed. 1983) ("In situations where there is a reliable market value, such value is, in many jurisdictions, presumptively

controlling; in other jurisdictions, market value is only one factor to be considered ... Of course, when there is no readily-ascertainable market value, various alternative indicia of value must be considered and weighted ...").

Thus, market value is relevant to a determination of the true intrinsic value of stock on a going concern basis whenever it is reliable, i.e. whenever it represents the amount that a willing buyer is willing to pay for the stock and the amount for which a willing seller is willing to sell the stock in an open and free market.[2] Market value becomes less relevant as its reliability decreases and may in fact properly be deemed irrelevant where it provides no reliable information as to the true value of the stock.

Pennsylvania cases are in accord with this view. In *O'Connor* itself, the Supreme Court found that although market value may generally be relevant, the market value of the stock at issue provided no guidance as to true value. The Court stated:

> This case presents an instance where a certain method of valuation has no applicability whatever.... [the company] is a closely-held family corporation having unlisted stock and therefore, no public market. Shares are sold too infrequently for market value to play any part in these proceedings ...

*Id.* 452 Pa. at 292 n. 6, 304 A.2d at 698 n. 6.

Following this analysis, in 1984 this court also affirmed a trial court conclusion that under the facts presented, the market value of the stock at issue should receive no weight in determining fair value. *In re Jones & Laughlin Steel*

---

2. The importance of market value where it is deemed reliable can perhaps best be illustrated by the fact that some states, including Pennsylvania, have adopted a "listed stock" exception in their appraisal statutes. *See, e.g.,* 15 Pa.Stat.Ann. § 1515 L & M. In Pennsylvania, this exception provides that where the stock in question is either listed on the New York or American stock exchange or is held of record by not less than 2,500 shareholders, in certain circumstances the appraisal remedy will not even apply. The rationale behind this exception is that under these circumstances, the dissenting shareholder can realize the true value of his stock simply by selling it on the open market. Henn, § 349. p. 1002 n. 12.

*Corp.*, 328 Pa.Super. 442, 477 A.2d 527 (1984). The *Jones* court correctly noted that *O'Connor* does not require a trial court to assign weight to each of the three valuation methods, but rather to consider whether each is relevant in the context of the particular case. In *Jones*, one corporate stockholder held over eighty percent of the stock being valued and there was evidence that that stockholder had a "controlling and restrictive effect on the market value of the remaining shares traded on the market." *Id.*, 328 Pa.Superior Ct. at 459, 477 A.2d at 535–36. The court also noted that there was other evidence that the market value was unreliable. For example, earnings had been understated and an announcement of an increase in earnings had had no effect on the market price of the stock. *Id.* *See also Bell v. Kirby*, 413 A.2d 137 (Del.1980) (no weight accorded market value where 95% of stock held by one corporate stockholder and there were only isolated trades of remaining shares); *In the Matter of Endicott Johnson Corp. v. Bade*, 37 N.Y.2d 585, 376 N.Y.S.2d 103, 338 N.E.2d 614 (1975) (market value accorded little or no weight where 70–80% stock held by one corporate stockholder and stock had been delisted from national exchange).

These cases instruct us that market value is to be totally disregarded in determining fair value only in a limited number of situations. That is, market value is to be entirely disregarded where there is competent and substantial evidence to support the conclusion that the value at which the stock is trading is not at all reliable in gauging the stock's intrinsic going concern value.

Applying this standard to the case *sub judice*, we find that the trial court erred in concluding that market value should be totally disregarded. We arrive at this conclusion despite our cognizance of the fact that the record reveals that the market value of the Company's stock is of limited importance in assessing the stock's fair value.

The trial court justified its refusal to consider market value on the following grounds:

... to consider the market value approach as a valid valuation method would be improper because the corporation as previously indicated was closely held and it was not traded on the open market as a result of national research being done on the history of the Company, and as such, did not and could not reflect its true value. Nearly half of the outstanding shares were held by relatives of the Glosser family or management personnel.

Trial Court Opinion at 3.

We concur in the conclusion that the fact that a high percentage of the outstanding shares of a corporation are closely held by one entity or group can indicate that the market value of the remaining shares is an unreliable guide to true value. *See O'Connor Appeal, supra; Jones, supra.* We also agree that thin trading in the remaining shares decreases the reliability of market value. *Id.* However, under the precise facts of this case, it is unwarranted to conclude that *no* weight is to be accorded market value.

Here, only 50–60% of the stock was closely held, as compared to the 80–100% levels of control that existed in those cases where market value has been disregarded. Although trading in the remaining Company stock was admittedly thin, the stock was listed on a national exchange and was steadily traded. Moreover, unlike *Jones,* this is not a case where there was any evidence of manipulation of the market or the exercise of control of the market by the family and management group. Finally, we do not see the relevance of the lack of "national research" having been done on the Company's stock. It would unquestionnably open a Pandora's box were we to require the trial court in every appraisal matter to investigate how much independently generated investment information was available concerning a listed stock before it was traded in order to determine how accurately the market was reflecting the stock's value.

We find this case most closely analogous to the recent case of *In re Spang Industries, Inc.,* 369 Pa.Super. 133, 535 A.2d 86 (1987) (allocatur denied 9/13/88), where the court

affirmed the trial court's weighting of market value at only ten percent (10%). The court justified this conclusion as follows:

As Industries' stock had been publicly traded, we find the trial judge properly included market value in his valuation considerations. We agree with the trial court that since Industries owned a majority of the stocks and the stock was lightly traded, it had a "controlling and restrictive" effect on the remaining shares being traded. Thus minimum value should be given to that consideration.

*Id.*, 369 Pa.Superior Ct. at 142, 535 A.2d at 90.

We reach the same conclusion here. Since the Company's stock was publicly traded, albeit thinly, and since the controlling group held only 50–60% thereof and did not manipulate market value, the trial court erred in totally disregarding market value. On remand, the trial court is instructed to include market value in its valuation considerations to a degree consistent with this opinion.[3]

C. *Expert Testimony and Exhibits Relevant to Net Asset Value*

Perhaps the Company's strongest objection to the trial court's valuation centers on the testimony of one of the dissenting shareholders' expert witnesses, Mr. Medwig, who testified as to the net asset value of the stock. Mr. Medwig, who is basically a tax accountant with experience in stock valuation, testified that the net asset value of the stock was $38.00 per share. This valuation was necessarily based upon Mr. Medwig's conclusions as to the true going concern value of the Company's assets, which value was

**3.** Judge Popovich dissents to this conclusion on the ground that it was within the trial court's discretion to disregard market value in this case. In so concluding, Judge Popovich regards as significant the fact that the Company's own offer of $20 was higher than average market value. Judge Popovich sees this as indicating the Company's own distrust of the market value as a true indicator of fair value. In contrast, the significance of this fact is only that the Company did not see market value as the *sole* indicator of fair value. This reveals only that the Company was aware of the teaching of relevant case law cited in text which includes market value as only one of many factors that may be considered in determining fair value.

then allocated on a per share basis. The trial court noted that there had also been testimony by an expert for the Company to the effect that the net asset value of the stock was $19.00 per share, but creditted Mr. Medwig's analysis and found a per share asset value of $38.00.

As stated above, the court gave no weight to the market value of the stock and opined that it would rely primarily on this asset value and to a lesser degree on the investment value as testified to by other expert witnesses. However, in light of what the court saw as an "obvious adversarial atmosphere", the court reduced its reliance on the net asset value to sixty-five percent (65%) and attributed (35%) to the investment value. As we construe the trial court's opinion, the court actually viewed this case as one where the asset value of the stock was the most reliable indicator of true going concern value. However, the court was also aware that the data it was provided on this value was influenced by the adversarial positions of the parties and their witnesses. In recognition of this fact, the court attempted to arrive at an equitable result by reducing its reliance on net asset value and giving more credit to the much lower investment value than the court was otherwise inclined to accord it.

■ The Company does not object to every portion of Mr. Medwig's testimony. They consistently have admitted that Mr. Medwig was qualified to testify to the asset value of the Company's stock insofar as he used "a balance-sheet oriented" approach, using as his source material the Company's own financial records. The Company also does not object to Mr. Medwig's reliance on value figures provided by an appraisal performed by Industrial Appraisals, Inc., which the Company had clearly adopted as being correct. The Company finds fault with Mr. Medwig's testimony and with the sources that underlay it only insofar as Mr. Medwig was permitted to testify as to the value of the Company's fixtures, equipment, vehicles and leasehold improvements on the basis of another appraisal of those assets performed at the Company's request by Manufacturers'

Appraisal Company and as to the value of certain leases based on Mr. Medwig's own calculation of their value.[4]

The Company contends that the Manufacturers' appraisal, which was admitted into evidence as part of Mr. Medwig's documentation of his calculations, was inadmissible hearsay since no one from Manufacturers was called to testify as to the appraisal. Thus, the Company argues that Mr. Medwig's testimony on the basis thereof was inadmissible as being based on facts not properly admissible into

4. In the Company's brief to this court, the Company also objects to the trial court's asset valuation on two other grounds in addition to those specific objections to Mr. Medwig's testimony which are discussed in text above. The objections are generally that Mr. Medwig relied on incorrect and internally inconsistent accounting methods in doing his asset valuation and that another expert witness for the dissenters, Mr. Reed, employed a variant of an asset valuation method which is totally unreliable.

We find these issues waived in that they were not specifically preserved in post-trial motions. Pa.R.C.P. 227.1. The only possible reference to such challenges to the asset valuation may be found in the Company's generalized post-trial statements that the trial court's asset valuation was incorrect. These general statements of error do not preserve issues on appeal.

We also note that were we to consider these issues, we would not find reversible error.

We additionally note that in footnote 12 of the Company's brief the Company mentions, without legal argument, three other alleged errors. None of these appear in the Company's Statement of Questions section of its brief and are, therefore, waived. Pa.R.A.P. 2116. However, one of these points does merit clarification and perhaps reconsideration by the trial court on remand. This concerns Mr. Reed's valuation testimony. The Company states that the trial court arrived at too high a figure for the investment value of the stock by considering Mr. Reed's testimony to be about investment value, whereas in fact the Company argues that Mr. Reed testified to a variation of asset valuation. We cannot determine on the record before us precisely how Mr. Reed's valuation testimony should be classified. Although Mr. Reed stated that he was applying his own variant of an asset value method, he also stated that he was actually computing an overall "fair value" of the stock. The trial court itself characterized Mr. Reed's testimony as asset valuation in the decree nisi, but in the final decree the court appears to have included Mr. Reed's $43.00 per share value in the investment value calculation. As noted above, we could consider this issue waived. However, because there appears to be confusion as to exactly how the trial court construed and relied on Mr. Reed's testimony, and in light of the fact that we must remand the matter in any event for reasons explained in text, the trial court should clarify

evidence. The Company also objects to Mr. Medwig's reliance on his own calculation of the value of certain of the Company's leases on the ground that he was not qualified to make such a calculation.

Appellees/cross-appellants counter that both the Manufacturers' appraisal and Mr. Medwig's testimony on the basis thereof was properly admitted. As to the appraisal itself, they argue that since the Company ordered the appraisal, referred to it in their proxy statement concerning the instant transaction, and used it in analyzing whether the Company might adopt a certain tax treatment of this transaction, it constitutes an adoptive admission of the Company. Alternatively, appellees argue that even assuming that the appraisal was inadmissible hearsay, Mr. Medwig's opinion on the basis thereof was nevertheless admissible under the theory of Federal Rule of Evidence 703, which permits an expert to testify on the basis of reports not in evidence and/or not admissible into evidence if the report is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." Fed.R.Evid. 703. Appellees also argue that Mr. Medwig was qualified to place a value on those of the Company's leases that had not been valued by anyone else using an accepted and conservative method of valuation based on comparable leases in the same area.

Preliminarily we note that in reviewing this issue, we must remain mindful not only of our limited scope of review of valuation determinations as set forth above, but also of the great discretion that is vested in a trial court concerning questions of the admissibility of evidence. *Bessemer Stores v. Reed Shaw Stenhouse*, 344 Pa.Super. 218, 496 A.2d 762 (1985). We will not disturb the decision of the trial court unless it is demonstrated to have been both an abuse of this discretion and harmful to the complaining party. *Id.* *See also Klyman v. Southeastern Pennsylvania Transportation Authority*, 331 Pa.Super. 172, 480 A.2d 299 (1984)

and, if necessary, correct its use of Mr. Reed's valuation testimony on remand.

(admissibility of expert testimony is matter initially for determination by trial court; reversal warranted only where discretion is abused).

Although the trial court has not provided us with any explanation for its admission of the evidence at issue, a review of the trial transcript reveals that the court was of the opinion that in the context of this non-jury trial, it should receive all of the available competent evidence on value and then make a determination as to the weight it would accord that evidence in making the ultimate valuation. Consistent with our foregoing discussion of the *Weinberger* case, we approve of this approach in general terms. In a non-jury action involving questions of such complexity where the court has exercised its option not to appoint an appraiser but rather to make its own valuation, we fully understand the court's desire to have at its disposal as much competent evidence, including expert opinion, as possible. We also approve of the trial court's realistic recognition, however, that the weight that should be accorded such evidence should be determined in light of the adversarial atmosphere that prevailed. We also presume that the weight to be accorded expert testimony will depend upon the court's assessment of the qualifications of the expert insofar as each area of his testimony is concerned. Thus, we reject the Company's challenge to the trial court's admission of Mr. Medwig's testimony on asset valuation and conclude that the Company's objection is more appropriately addressed to the weight to be accorded to such testimony, which the trial court reduced to sixty-five percent (65%).

■■■ We begin with the Company's second objection to Mr. Medwig's testimony regarding the extent to which he relied on his own calculation of the value of certain of the Company's leasehold interests. The Company argues that Mr. Medwig, who was not a real property appraiser, was not qualified to give an opinion on the value of these leases and, therefore, this aspect of his testimony was inadmissible. As to some of the Company's leases, Mr. Medwig

based his conclusions on the appraisals or computations of value done by Industrial Appraisals, which the Company adopted as reliable. As to others of the leases, as to which there was no actual appraisal or computation of value by an appraiser, Mr. Medwig did his own computations of value based on a computation of value the Company itself and/or its accountants had used for those leases. As to the remaining 21 leases the Company had, Mr. Medwig did a valuation of his own. It is as to these values that the Company objects.

Mr. Medwig fixed a value on these leases basically by using comparable values of other comparable store leases in the same area. His technique was the same as that used by the Company and/or its accountant in valuing certain other of its leases. Apparently, he determined the "economic rent", i.e. the rent which comparable properties in the same area would bring and deducted the actual rent the Company was paying at each location multiplied by the number of years left on the lease. He then reduced this number to present value.

Mr. Medwig was properly qualified as an expert as to stock valuation. Pennsylvania law imposes a liberal standard for qualification of an expert, allowing a witness to testify as an expert if he has any reasonable pretension to specialized knowledge on the subject under investigation. The weight to be given to his evidence is for the factfinder. *Commonwealth v. Gonzalez*, 519 Pa. 116, 546 A.2d 26 (1988) (plurality) (citing *Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 338, 319 A.2d 914, 924 (1974)). Given this broad standard, particularly when applied in the context of a valuation proceeding where the court needs a broad variety of information relating to the true value of the stock at issue, we cannot say that the trial court erred in admitting Mr. Medwig's proposed valuation of certain of the Company's leases.

Obviously the valuation method Mr. Medwig used was not as reliable as an actual appraisal. We note, however, that it was in accordance with a method the Company itself and its

accountants had used for other leases. It was also in accord with the general principle that interests in real estate can be valued by comparison to similar properties in the same area. *Philadelphia and Reading Coal and Iron Co. v. Commissioners of Northumberland County,* 323 Pa. 185, 186 A. 105 (1936); *McKnight Shopping Center, Inc. v. Board of Property Assessment Appeals and Review of County of Allegheny,* 417 Pa. 234, 209 A.2d 389 (1965). Thus, although we would not find Mr. Medwig qualified to appraise the value of these leases as an appraiser, which he admittedly was not, we cannot say that the trial court erred in permitting Mr. Medwig to posit a value for them based upon data concerning these leases and comparable proper-ties in the same area, as the Company's own accountants had done as to other leases. The Company's objection to Mr. Medwig's testimony as to the value of these leases is more properly addressed to the weight to be accorded this aspect of the testimony, rather than to its admissibility and Mr. Medwig's qualifications to give it.

█ We now turn to the more difficult issue of the admissibility of Mr. Medwig's testimony concerning the value of the Company's furniture, fixtures, equipment and vehicles, as to which he relied on the Manufacturers' appraisal. Since Mr. Medwig was not an appraiser, but rather an expert in stock valuation, he necessarily had to rely on some source of information regarding the value of the assets underlying the stock other than facts within his own personal knowledge. Most of these facts were provided to Mr. Medwig in the manner an expert customarily receives the information necessary to form an opinion in a particular case. He relied largely on the Company's own financial records as to the value of their property, calculations of that value performed for the Company by their own accountant, appraisal reports that the Company had ordered and records of the actual value received by the Company for one large sale of similar assets. The Company's objection is directed to the fact that as to one group of assets,

the underlying appraisal was allegedly both inadmissible and incorrect.

We agree with the Company to the extent that it argues that the Manufacturers' appraisal itself, attached to Mr. Medwig's calculations, would be inadmissible hearsay if offered to prove the truth of the matters asserted therein. It is an out-of-court statement and those who could testify and be cross-examined as to its contents were not called. *Commonwealth v. Cassidy*, 315 Pa.Super. 429, 462 A.2d 270 (1983). Moreover, the Company's limited use thereof does not constitute an admission of its accuracy. The Company used the appraisal numbers only as a posited value of its assets to ascertain whether, using those numbers, the Company could elect a certain tax treatment of the merger transaction. The Company never took the tax election and therefore never used the appraisal numbers in a manner that reflected their acceptance thereof.

This does not convince us, however, that it was error for the court to admit the appraisal as part of Mr. Medwig's report or that Mr. Medwig's testimony, to the extent it relied on the Manufacturers' appraisal, was also inadmissible. Once again, we view the Company's objection as being more properly addressed to the weight to be accorded Mr. Medwig's testimony than to its admissibility.

We recognize and do not question the propriety of Pennsylvania law's general requirement that an expert witness base his testimony only on facts of record. *Commonwealth v. Paskings*, 447 Pa. 350, 290 A.2d 82 (1972); *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). However, we view this case as falling squarely within an exception to that rule which we also consider to be a salutary principle in our law.

The rule that restricts the basis for an expert's opinion to facts properly of record is grounded in the view that while an expert may have a particular expertise in judging the consequences attendant upon a certain factual matrix, or the causes therefor, or the significance thereof, he cannot base this expert judgment on conjecture concerning those

facts. *Collins v. Hand, supra.* However, courts have now begun to recognize that there are situations where the source of factual material relied upon by an expert is not admitted and/or admissible in evidence but is nevertheless not the product of mere conjecture by the expert. It is rather the type of source material the expert reasonably would rely on in forming his expert opinion. Thus, many courts have begun to liberalize their view as to the permissible underpinnings of expert testimony. The general exception that has been recognized is that set forth in Federal Rule of Evidence 703:

> If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This exception has now been applied in a number of Pennsylvania cases. In *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971), the Supreme Court permitted expert medical witnesses to express their opinions based, in part, upon reports of others which are not in evidence but which the experts customarily rely upon in the practice of their profession. This application of the exception, to the testimony of medical experts, has perhaps been the most widely recognized application. It is certainly not the only scenario in which the exception has been applied. For example, in *Steinhauer v. Wilson*, 336 Pa.Super. 155, 485 A.2d 477 (1984), the court allowed an expert testifying as to construction costs to base his opinion in part on estimates of contractors not in the record. *See also Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215 (1987), *allocatur denied*, 518 Pa. 627, 541 A.2d 1138 (1988) (expert accountant may rely on tax returns and financial statements in computing lost profits); *Kearns by Kearns v. DeHaas*, 377 Pa.Super. 200, 546 A.2d 1226 (1988).

The other area in which Pennsylvania law has for some time permitted experts to testify on the basis of reports of others not in evidence is the area of eminent domain proceedings. In such matters, valuation experts have been

permitted to testify on the basis of appraisals performed by others who are not called to testify as to their appraisals. The Supreme Court explained and applied this principle in *Pittsburgh Outdoor Advertising Corp. Appeal,* 440 Pa. 321, 327, 272 A.2d 163 (1970), as follows:

> The remaining argument pressed by Outdoor is the incompetency of the testimony of the Authority's valuation expert. This is premised on the witness' reliance on the written appraisal report of a qualified engineering firm in determining the value of the billboards based on reproduction cost less depreciation. No copy of the report had been furnished to Outdoor, and no representative of the engineering firm was called as a witness.
>
> The use by a testifying valuation expert of facts and figures derived from others and of which he himself does not have personal knowledge occurs frequently and is not a new development. To require direct personal knowledge by the expert witness of every element going to make up an appraisal figure would be to require the impossible. That there may be some hearsay evidence comprised within opinion evidence is undeniable. The components of an expert's opinion, however, go to weight, not admissibility.

*See also B.P. Oil Company, Inc. v. Delaware County Board of Assessment Appeals,* 114 Pa.Commw. 549, 539 A.2d 473 (1988).

*Pittsburgh Outdoor* does not stand alone. In *McCormick on Evidence,* the author notes that valuation proceedings are another area, like medical expert testimony, where there is a growing trend toward allowing valuation experts to testify on the basis of facts not within their personal knowledge and outside the record. Cleary, *McCormick on Evidence,* § 15, 39 n. 3 (3d ed. 1984).

The Company attempts to distinguish such cases first by noting that they are decided under the Eminent Domain Code, which specically allows an expert to testify as to the bases of his opinion both within and without the record. We do not read the *Pittsburgh Outdoor* opinion as being

based solely upon this provision of the Code. The portions of the opinion quoted above reveal that the court found the reliance of a valuation expert on "facts and figures derived from others" to be a practical necessity in such cases.

The Company also argues that in such cases the testifying valuation experts were relying upon reports of other identical valuation experts and thus could fully judge the reliability of the reports on which they relied. However, in *Pittsburgh Outdoor* itself the testifying valuation expert based his opinion on the report of an engineering firm as to reproduction costs of the property being valued. The opinion does not state that the testifying expert was himself an engineer who did or could calculate reproduction costs. It was indeed perhaps because the valuation expert was not himself engaged in calculating reproduction costs that he relied on the data of a qualified engineer as to such costs.

Moreover, we note that the *Pittsburgh Outdoor* rule has equally been applied by the Commonwealth Court to the testimony of an owner of property regarding the value thereof. *Redevelopment Authority of the City of Harrisburg v. YWCA*, 44 Pa.Commw. 295, 403 A.2d 1343 (1979). Since an owner is deemed to be qualified to express an opinion as to the value of his or her property, even though he or she has no independent qualifications as a valuation expert, the court found *Pittsburgh Outdoor* applicable and allowed the owner to express her opinion as to value on the basis of material outside the record. The court specifically rejected the argument that the *Pittsburgh Outdoor* rule did not apply because the owner, not otherwise expert in valuation matters, was not qualified to judge the reliability of the sources on which she relied. *Id.* at 299, 403 A.2d at 1345.

We find that the rationale of *Pittsburgh Outdoor* and similar cases, as well as the general rationale of Federal Rule of Evidence 703, argue forcefully for the admission of Mr. Medwig's testimony on the asset valuation of the Company's stock despite his partial reliance on the Manufacturers' appraisal. The appraisal was admitted into evidence only as an exhibit to Mr. Medwig's written calculations,

since those calculations included a reference to the appraisal. Thus, it was admitted only to provide the court with a complete copy of the source of some of the figures underlying Mr. Medwig's calculations. *See N.J. Sports & Exposition Authority v. Cariddi,* 164 N.J.Super. 127, 395 A.2d 895 (1978), *aff'd,* 84 N.J. 102, 107, 417 A.2d 529 (1980).

We also note that the appraisal carries its own "circumstantial guarantee of trustworthiness" to the extent that it was prepared by a professional appraisal company and one that the Company itself chose to appraise its assets. It is also important that Mr. Medwig did not rely exclusively on the Manufacturers' appraisal of the subject assets. He compared the values placed by the appraisal with the values actually received by the Company in a sale of such assets consummated shortly after the merger. Having done so, Mr. Medwig found that the Manufacturers' values were conservative when compared to the values received for such assets in an actual sale. Thus, Mr. Medwig's use of the appraisal numbers was based not only on the appraisal but also on his own confirmation of their reliability.

Moreover, it is clear that any stock valuation expert need not be qualified to do his own appraisal of each of a corporation's assets in order to place a value on the stock. Such an expert will quite commonly rely on "facts and figures" provided by other experts in reaching an ultimate valuation determination. The crucial point is that the court (or jury) be fully informed that these facts were in fact the partial basis for the expert's opinion. The adverse party then has the opportunity, as the Company here did, to present its own countervailing facts and figures and/or expert testimony to convince the factfinder that the weight to be given to the other side's expert testimony should be little or none.

Here, although the trial court largely credited Mr. Medwig's analysis that the asset value of the stock should be $38.00, the court reduced its reliance on that value to sixty-five percent (65%), thereby taking cognizance of the possible effect the adversarial quality of the testimony

might have had on the valuation number. We find no error in this approach.

### D. *Failure of Trial Court to Tax Effect Asset Valuation*

■ The last of the Company's specific objections to the trial court's determination focuses on the trial court's refusal to consider the alleged tax effect of writing up certain of the Company's assets. Simply stated, the Company alleges if its assets really have the higher value appellees would assign to them, then in the event the Company sold these assets and realized their value, the Company would also incur a higher tax liability on the sale. The Company argues that this potential tax liability should be considered to reduce the overall value of the Company's assets. Although the trial court did not specifically address this contention in its opinion, it did accept Mr. Medwig's asset valuation, which did not include tax effecting.

The Company supports its argument in this regard not by reference to any expert testimony on its own behalf regarding the propriety of tax effecting a write up of assets, but rather by reference to the comment of the *O'Connor* court that tax liabilities are one factor to be considered in valuing stock in a dissenters' rights case. *O'Connor Appeal*, 452 Pa. at 292, 304 A.2d at 698. We do not read the *O'Connor* court's passing reference to tax liabilities as being at all directed to the issue under consideration here. The *O'Connor* court was clearly referring only generally to the pertinence of actual tax liabilities in valuing stock. We find nothing in the opinion that provides guidance as to the question of whether the potential tax effect of assigning a higher value to a corporation's assets than the book value thereof should be considered in valuing the stock. In fact, we have found no reference to this issue in any reported Pennsylvania case.

Our independent analysis of this issue has led us to conclude that the trial court did not err in accepting Mr. Medwig's testimony. Mr. Medwig testified that since the

valuation of the stock was to be made on a going concern basis, and the assigning of a higher value to the assets was therefore really an assessment of their true value in an operating business, it would be unrealistic to consider any higher tax that might be incurred as a result of this higher value. This is so because such a tax liability would only actually be incurred in the event of a liquidation of the business wherein the higher value was realized. Since the valuation was not predicated on a liquidation, consideration of the tax effect of a liquidation was unwarranted.

Given this testimony by a qualified expert, and the *O'Connor* court's admonition that valuation in fact be done on a going concern basis, we find that the trial court's rejection of the Company's argument on tax effecting is supported by competent and substantial evidence of record. Thus, we will not disturb the trial court's ruling on this ground.

### III. *Intervention of Mr. Wurzburger and Wurzburger, Morrow & Keough, Inc.*

The Company's last issue on appeal concerns the trial court's decision to grant the petition of Mr. Wurzburger and his wholly owned corporation, Wurzburger, Morrow & Keough, Inc., to intervene in these proceedings as dissenting shareholders. The gravamen of the Company's argument is that these shareholders did not comply with the requirements of Section 515 for perfecting rights as a dissenting shareholder.

We begin with a summary of the requirements of Section 515. In order to perfect a right to an appraisal of the fair value of stock and the payment of that value, Section 515 first requires that a dissenting shareholder make written objection to the proposed corporate action from which the shareholder dissents prior to the commencement of the voting of the shareholders on such action. Section 515 next requires that the dissenter not vote in favor of such action and, within twenty (20) days after the shareholder vote thereon, make written demand on the corporation for pay-

ment of the fair value of his/her shares. Such written demand must uniformly be made for all of the shares of which such shareholder is the beneficial owner, i.e. a shareholder cannot dissent as to some but not all of the shares he beneficially owns. 15 Pa.Stat.Ann. § 1515 B. The statute makes these requirements mandatory by stating that any shareholder who does not file written objection and then demand fair value is "conclusively presumed" to have consented to the proposed corporate action and may withdraw such consent only with the corporation's consent. *Id.* § 1515 B & 1515 C.

The statute also requires that within twenty days after the shareholder makes written demand for payment of the fair value of his shares, he shall tender the certificates representing those shares to the corporation for notation thereon that the demand has been made. *Id.* § 1515 I. Unlike the requirements of sub-sections B and C of Section 515, this requirement is not invariable. Section 515 states that a shareholder's failure to comply "shall at the option of the corporation terminate his rights under this section unless a court of competent jurisdiction for good and sufficient cause shown shall otherwise direct." *Id.*

In this case, the Company consented to a slight variation on the requirements of the statute. In settling a separate lawsuit brought by dissenting shareholders against the Company, the Company executed a Stipulation and Agreement, to which both Mr. Wurzburger and Wurzburger, Morrow & Keough, Inc. were parties and which provided as follows:

Any holder of Stock as of the record date (the "Record Date") for the special meeting of the shareholders of Glosser held on September 12, 1985 (the "Special Meeting") who has timely filed either a written objection to the Merger or a written demand for payment of the fair value of his shares and who complies with the provisions of Section 515I of the Pennsylvania Business Corporation Law (the "PBCL"), shall be entitled to receive the fair value, as determined in accordance with Section 515 of

the PBCL, of all shares as to which such objection or demand was submitted, except that the issue of whether beneficial holders who have accepted payment for part of their shares are or are not entitled to receive fair value as determined in accordance with Section 515 for shares as to which they have not accepted payment shall not be affected by this settlement agreement and shall be decided in the appraisal proceeding.

The plain meaning of this agreement is that although the Company waived Section 515 B & C's requirements of both written objection and written demand for payment of fair value, allowing either to suffice, it did not waive the Section 515 I requirement of tender for notation. This the Company intended to insist upon and there is no evidence of record that the Company ever waived it.

Both Mr. Wurzburger and his corporation objected to the proposed merger of the Company in writing prior to the September 12th shareholder vote and thus fulfilled this aspect of perfecting their dissenting shareholder rights. However, neither ever tendered its share certificates for notation under Section 515 I.

The Company argues that this omission is fatal. It persuasively notes that the statute allows the Company the option unilaterally to terminate these shareholders' dissenters' rights. Mr. Wurzburger and his corporation counterargue that, as the trial court decided, they have shown "good cause" to be excused from this requirement. Wurzburger does not offer any explanation for why he did not comply with Section 515 I and his testimony, although somewhat equivocal, does indicate that he was aware of the Section 515 I requirement. Rather, the "good cause" that Wurzburger posits and that the trial court accepted consisted solely in the fact that one other dissenting shareholder, Mr. Yuhas, allegedly also did not tender his shares for notation and yet the Company has decided to afford him dissenting shareholder rights. At oral argument on the petition to intervene, counsel for the Company justified its treatment of Mr. Yuhas as compared to Mr. Wurzburger by

stating that the Company took account of Mr. Yuhas' lack of sophistication in granting him dissenters' rights, while it felt that Mr. Wurzburger, a stockbroker for years, and his corporation were well aware of what needed to be done to perfect their rights.

The requirement of "good cause" for excusing a shareholder from tendering his/her shares that appears in Section 515 I is not defined in our appellate case law. It has been construed only twice in recorded trial court opinions. In *Hamberg v. Pittsburgh Western Land Corp.*, 115 P.L.J. 85 (1966), the court held that where a shareholder had tendered his shares three days late and there was no showing of prejudice to the corporation as a result thereof, the lack of precise compliance with Section 515 I would not operate to deny the shareholder of his dissenters' rights. *Id.* On the other hand, in *In re Associated Wholesalers, Inc.*, 35 D. & C.2d 763 (1966), the court construed Section 515 I's good cause requirement as imposing on the shareholder the burden of demonstrating some legal or equitable reason why it would be unfair or unjust to deny him dissenters' rights despite his non-compliance. *Id.* Since the shareholders in the *Wholesalers* case provided no explanation for why they had failed to tender, the court denied them dissenters' rights.

We agree that the burden is on the shareholder to show why he should be afforded dissenters' rights. The statute provides the corporation the "option" of terminating the shareholder's rights. If the exercise of this option is to be questioned, the shareholder has the burden of showing why. We also view the good cause shown requirement as properly focussing on whether there was a reasonable explanation for the failure to comply or other reason why the corporation's termination of the shareholder's dissenters' rights was unwarranted, and not whether there was prejudice to the corporation. Whether there was prejudice to the corporation may only be relevant in a case, such as *Hamberg*, where there is only a de minimus technical deviation from the requirement of Section 515 I that had no effect on

the corporation and the court, therefore, determines that substantial justice requires that the deviation be ignored. That is not the case here.

Here, Wurzburger and his corporation have never tendered their shares and offer no explanation for their failure to do so. They posit only that they have been treated unfairly vis-a-vis Mr. Yuhas. While we agree that the corporation has an obligation to deal fairly with all of its shareholders in exercising its option under Section 515 I, the mere fact that Mr. Yuhas was listed as a dissenter by the Company while Wurzburger was not does not establish "good cause". In such a circumstance, we conclude that the trial court erred in affording Wurzburger and his corporation dissenting shareholder rights. They must be excluded from this proceeding on remand.

IV. Cross–Appeal

■■■ Appellees/cross-appellants appeal from the trial court's determination that interest on the appraised value of the stock should run at the rate of eight percent (8%), which the parties stipulated to be the prudent investor's rate. They contend that the proper rate of interest should be the average rate currently paid by the Company on its borrowings. This rate was stipulated to be 11.3%.

The Company initially argues that the cross-appeal must be quashed because it was untimely. We must, of course, give full consideration to this contention at the outset, since it impacts upon our jurisdiction over the cross-appeal. *Murphy v. Brong*, 321 Pa.Super. 340, 344, 468 A.2d 509, 51 (1983).

The facts pertinent to the timeliness of the cross-appeal are as follows. The Company filed its appeal in a timely fashion on July 27, 1987. Pursuant to Rule of Appellate Procedure 903(b), appellees/cross-appellants then had 14 days within which to file their cross-appeal. On July 30, 1987, Pittsburgh counsel for appellee/cross-appellants prepared a Notice of Appeal and transmitted it by courier to their local counsel in Cambria County for filing with the

prothonotary of the trial court as is required by Rule of Appellate Procedure 905. They also served copies of the Notice on counsel for the Company, the trial judge and the trial court administrator. The original notice of appeal was never filed. The courier's receipt indicates that the package containing it was received by local counsel, but local counsel can offer no explanation for what happened to the document thereafter. It was simply lost.

On August 7, 1987, Pittsburgh counsel for appellees/cross-appellants received a docketing statement from this Court. It did not reflect the filing of a cross-appeal. Counsel addressed a letter to this Court noting the omission of the cross-appeal on the appellate docket and positing that perhaps the notice thereof had not timely been transmitted by the prothonotary of the trial court. Counsel apparently did not then check the trial court docket to make sure his client's Notice of Appeal had in fact been filed.

On November 7, 1987, when the Company filed its brief in this Court, the cover page indicated that there was a cross-appeal. This court contacted counsel for appellees/cross-appellants to inquire as to why no cross-appeal appeared on this Court's docket. On November 24, 1987, appellees/cross-appellants filed a Petition to Allow Filing of Cross–Appeal Nunc Pro Tunc in this Court. We remanded the Petition to the trial court for initial determination of whether the late filing should be permitted under the rationale of *Bass v. Commonwealth*, 485 Pa. 256, 401 A.2d 1133 (1979), which permits late appeals where the late filing is caused by "non-negligent happenstance" and the appeal is then filed within a very short time, thus reducing any possible prejudice to the other side.

On January 4, 1988, the trial court held a hearing on the Petition, found that the cause of the late filing was non-negligent happenstance and granted the Petition. On January 15, 1988, appellees-cross/appellants filed their Notice of Appeal.

The Company renewed its contention that the cross-appeal should be quashed by filing a Motion to Quash in this

Court. Decision on the Motion was referred to this panel. We find that the trial court abused its discretion in allowing this late-filed appeal and, therefore, will quash it.

We recently reviewed the *Bass* decision and its progeny in *In re Interest of C.K.*, 369 Pa.Super. 445, 535 A.2d 634 (1987). We need not repeat that analysis at any great length here. In sum, we concluded that although *Bass* was unquestionnably binding precedent in this Commonwealth, its scope was exceedingly limited. *Id.* and cases cited therein.[5]

Appellees/cross-appellants have offered no factual justification for their late filing. There was no fraud or breakdown in the processes of the court system, which are the traditional bases for the allowance of a late appeal. *Id.; West Penn Power Co. v. Goddard*, 460 Pa. 551, 333 A.2d 909 (1975). There was also no non-negligent happenstance following shortly by the filing of the appeal, as occurred in *Bass*. There was a simple omission to file the Notice of Appeal, unexplained by appellees/cross-appellants, and a failure to follow-up when, on August 7, 1987, counsel for appellees/cross-appellants was on notice that no cross-appeal had been docketed in this court. It was not until November 1987 that appellees/cross-appellants finally took action to ascertain the status of their cross-appeal and to petition this court to accept it. There is no resemblance in these facts to those in *Bass* or in those few cases applying *Bass*. *See* footnote 4, *supra.*[6] Thus, the cross-appeal must be quashed.

5. *Bass* has been applied by the Commonwealth Court on several occasions. *See, e.g., Perry v. Unemployment Comp. Bd. of Rev.*, 74 Pa.Commw. 388, 459 A.2d 1342 (1983). In each, the non-negligence of counsel in late filing was clear.

6. In a permitted post-submission communication by appellees/cross-appellants to this court, they argue that the fourth sentence of Rule of Appellate Procedure 905 "appears" to apply to the instant situation and would permit the late-filing of this cross-appeal. That sentence states "If a notice of appeal is mistakenly filed in an appellate court, or is otherwise filed in an incorrect office within the unified judicial system, the clerk shall immediately stamp it with the date of receipt and transmit it to the clerk of the court which entered the order appealed from, and upon payment of an additional filing fee

■ We further note that if we were to decide otherwise as to quashal, we would nevertheless affirm the trial court's interest award. Section 515 provides that the trial court shall award such interest as the court may find to be fair and equitable under all the circumstances. This provision has been construed to vest a broad discretion in the trial court, including even the denial of any interest. *See O'Connor Appeal*, 452 Pa. at 298, 304 A.2d at 701 (statute requires award of interest except where inequitable situation exists; computation of interest may be done by several techniques, any one of which could be employed by trial court). We also note that in the only Pennsylvania case directly addressing the rate of interest payable to dissenting shareholders, *In re Jones & Laughlin Steel Corp.*, 328 Pa.Super. 442, 477 A.2d 527 (1984), we affirmed the trial court's award of interest based on the "prudent investor" standard, finding this to be fair compensation to the dissenters for the deprivation of the fair value of their stock from the effective date of the merger. *Id.*, 328 Pa.Superior Ct. at 462, 477 A.2d at 537. *See also Universal City Studios, Inc. v. Francis I. DuPont & Co.*, 334 A.2d 216 (Del.1975) (Supreme Court of Delaware accepts prudent investor rate of interest). Thus, we would find no error in the trial court's interest award.

The cross-appeal is quashed.

IV. Disposition

The trial court's final decree dated June 30, 1987 is reversed insofar as it grants the Petition to Intervene of Wurzburger and Wurzburger, Morrow & Keough, Inc. The

the notice of appeal shall be deemed filed in the trial court on the date originally filed."

Appellees/cross-appellants contend that this portion of this rule allows us to accept their cross-appeal because they served their Notice of Appeal on the trial judge and the court administrator, as is required by Rule of Appellate Procedure 906. Presumably appellees/cross-appellants would have us construe this to be a filing of the notice in another office of the judicial system.

Our short answer to this contention is that service pursuant to Rule 906 is not filing pursuant to Rule 905.

trial court's final decree is also reversed insofar as it results from no weight being assigned to market value. The case is remanded for a recalculation of value which includes the assigning of some weight to market value in a manner consistent with this opinion and for clarification or modification as directed in footnote 3 of this opinion. The court may receive such additional evidence on these points as it deems necessary. The court's final decree is in all other respects affirmed. Jurisdiction is relinquished.

POPOVICH, J. files a dissenting statement.

POPOVICH, Judge, dissenting statement:

When reviewing an appeal from a trial court's determination of the value of a corporation under § 515 of the Business Corporations Law, 15 Pa.S.A. § 515, our scope of review encompasses only an ascertainment of whether the findings of the trial court are supported by competent evidence. We do not review the credibility of facts. *Appeal of O'Connor*, 444 Pa. 206, 208, 283 A.2d 279, 280 (1971). See also *O'Connor Appeal*, 304 A.2d 694. Upon review, I would find that the trial judge based his decision upon credible evidence and did not abuse his discretion in deciding not to consider the market value of the company's stock as a valuation factor under the circumstances of this case. See *In re Spang Industries, Inc.*, 369 Pa.Super. 133, 535 A.2d 86 (1987) (trial court was within its discretion when it excluded book value as an unreliable indicator of corporate value).

As the majority points out, "market value is to be entirely disregarded where there is competent and substantial evidence to support the conclusion that the value at which the stock is trading is not at all reliable in gauging the stock's intrinsic going concern value." Majority Opinion at 135. See *In re Jones & Laughlin Steel Corp.*, 328 Pa.Super. 442, 477 A.2d 527 (1984); *In the Matter of Endicott Johnson Corp. v. Bade*, 37 N.Y.2d 585, 376 N.Y.S.2d 103, 338 N.E.2d 614 (1975); *O'Connor Appeal*, 452 Pa. 287, 292 n. 6, 304 A.2d 694, 698 n. 6 (1973). Instantly, the court observed that

the controlling group held 50–60% of the corporation's stock, the stock was thinly traded, albeit publicly, and the stock buy-out offer of $20.00 per share was considerably higher than the $14.00 per share market value. Based upon those facts, the trial court determined that the market value of the corporation "did not reflect its true value." Trial Court Opinion at 3. As stated in *Spang Industries*, 535 A.2d at 91, "[t]he trial court may reject any factor which he believes to be unreliable." Thus, I am convinced the trial court *sub judice* acted well within its discretionary powers.

Presently, the trial court was not the only participant who rejected market value as an accurate indicator of corporate worth. The appellants' buy-out offer of $20.00 per share for a stock which the market valued at $14.00 per share was, in fact, a potent acknowledgment by the appellants that the trial court was correct in evaluating market value as unreliable. I am unable to find any abuse of discretion in the court's decision when the appellants freely admit that the market grossly undervalued the corporation's stock. Therefor, I must dissent from that portion of the majority's decision which remands the case with instructions "to include market value in its valuation considerations to a degree consistent with this opinion." Majority Opinion at 192.