## Taylor-Moreland v. Smith

C.P. of Bucks County, no. A06-97-61750-C-19.

*Jeffrey Liebmann,* for plaintiff.
*Arthur Klein,* for defendant.

DEVLIN SCOTT, *J.,* August 11, 1999—Darlene Taylor-Moreland has appealed our May 28, 1999 order granting Adam Smith primary physical custody of the parties' child, Corey Smith. We offer this opinion in support of our decision.

The parties were never married. At the time their minor child was born in October 1988, the parties had been living together for approximately six years. They separated in the early fall of 1989. They then resumed living together from approximately January 1991 until approximately January 1992. Mother, aged 38, has been married since April 1994 to Christopher Moreland who is in the United States Navy. As of the time of the hearing, Mother did not work outside the home. She had one daughter, Kayla Moreland, aged 3, and is expecting another child shortly. Father, aged 34, had been married since November 1997, to Nicolette Smith. Father was employed as a press operator. His wife was an environmental engineer. Mrs. Smith is expecting a child in January 2000. Both Mother and Father had numerous family members in the eastern Pennsylvania area that were close with Corey.

Mother's husband, Christopher Moreland, was stationed in Hawaii at the time of Mother's marriage to him in April 1994. Mother followed him to Hawaii in May 1994. Corey remained with his father in Pennsylvania until September 1994, when he went to stay with his mother in Hawaii. Father visited Corey in Hawaii in April 1995. Corey spent the summer of 1995 at his father's in Pennsylvania. In November 1995, Corey, his mother and her family returned to the Warminster, Bucks County area when Christopher Moreland was transferred to the Willow Grove Naval Air Station.

From the time of Corey's birth until he went to Hawaii, Mother was the primary custodian of him, although Father had significant partial custody. After Mother returned from Hawaii in November 1995, the parties had equal custody as discussed more fully below. In September 1998, Mr. Moreland was notified that he was being transferred back to Hawaii for at least four years. Father wanted Corey to remain in Pennsylvania with him. As a result, this custody proceeding was initiated.

On December 17, 1998, we entered an order that the parties participate in the court conciliation and evaluation service (CCES) program. On March 30, 1999, Sondra W. Friedman L.S.W. issued her six-page report recommending that Mother have primary custody of Corey in Hawaii. Father disagreed. Therefore, we held a custody hearing on May 28, 1999. At the hearing, we incorporated into the record the March 30, 1999 CCES report of Ms. Friedman. We also heard testimony from Mother, the maternal grandmother, a teacher at Corey's school, Father, Father's wife, the paternal grandmother and a step-aunt. At the conclusion of the hearing, we entered an order granting Father primary physical cus-

tody during the school year and Mother primary physical custody during the summer under the circumstances that Mother is in Hawaii. Mother has appealed this order.

Mother has filed the following statement of the matters complained of on appeal:

(1) The trial court erred when it did not examine the minor child, Corey, in chambers, regarding his wishes concerning Mother and Stepfather's relocation to Hawaii.

(2) The trial court erred in placing undue weight on the minor child's contact with his extended family.

(3) The trial court erred in improperly applying the relocation guideline factors of *Gruber v. Gruber*.[1]

(4) The trial court erred in placing undue and improper weight on the conciliator's request to Mother that she provide as much contact between Father and child prior to the child relocating to Hawaii, thereby resulting in the court determining that Father had joint physical custody of the minor child. Said determination that Father had joint physical custody of the minor child was contrary to the evidence and was arbitrary and an abuse of discretion.

(5) The trial court's determination that Father had joint physical custody with Mother was contrary to the evidence, and the report of court conciliator, and was arbitrary and an abuse of discretion.

(6) The trial court erred in separating the minor child, Corey, with his two half sisters, one of which was yet unborn at the time of the trial.

---

1. 400 Pa. Super. 174, 583 A.2d 434 (1990).

(7) The trial court's determination that Mother had, on one occasion in Christmas 1994, denied partial custody to Father was contrary to the evidence and was arbitrary and an abuse of discretion; and that Father, therefore, would more adequately facilitate a partial custody arrangement, was also contrary to the evidence and the report of court conciliator, and was arbitrary and an abuse of discretion.

(8) The trial court's order that, when Mother relocates to Hawaii, primary physical custody of the minor child shall be with Father during the school year, and partial custody shall be with Mother in the summers, is contrary to the best interest of the minor child.

(9) Defendant, Darlene Taylor-Moreland, reserves the right to supplement this statement upon receipt of the transcript.[2]

We will discuss each of these issues below.

### (1) *Trial Court Did Not Err When It Did Not Examine the Minor Child, Corey, at the Time of Trial*

We find it incredible that Mother raises this as an issue on appeal. We asked counsel on the record whether they wanted this court to talk to the child. Both counsel indicated that they would prefer that this court *not* talk to the child. (N.T., pp. 154-56.) We noted at trial that we had the benefit of the child's statements to Ms. Friedman. The CCES report stated in relevant part:

"In discussing his relationships with his parents and stepparents, Cory (sic), describes close, loving relationships with his family. He says that he would like to live

---

2. No supplementation has been received as of the date of this opinion.

with either parent, and that the most difficult aspect of the situation is that he will miss whichever parent he does not live with. He says that the hardest thing about living in Hawaii in the past was missing his father."

Neither party disputed that this was the child's position. Further, in this case, we were concerned that the child would feel that it was his burden to choose between his parents with whom he presently had equal time. Moreover, Mother thanked this court on the record, when, after discussing the issue with counsel, it was agreed by counsel that this court would not interview Corey. (N.T., p. 156.) The parties and counsel recognized that it was in Corey's best interest in this situation to not subject him to an interview by the court. By her agreement that Corey not be interviewed, Mother has waived any right to raise this issue on appeal. (See *Fillmore v. Hill,* 445 Pa. Super. 324, 665 A.2d 514 (1995).)

### (2) *The Trial Court Did Not Err in the Weight It Placed on the Minor Child's Contact With His Extended Family*

There was no dispute that Corey had a very close relationship with his maternal grandmother, Rolleesa Thurman. Over the course of years, he had spent significant time with her. (N.T., p. 168.) At the time of the hearing, he was staying in her house with his mother during Mother's custodial periods. There is also no dispute that Corey has a very close relationship with his paternal grandmother, Mary Smith. He traditionally had spent significant time also with her. (N.T., p. 79.) There are various other relatives in this area that Corey also sees. Both sides of the family have always been cordial to each other. The CCES report noted, "(Corey) has a large ex-

tended family, and sees his relatives often." (Report, p. 4.)

Corey's relationship with his extended family in this area was a significant factor which we appropriately considered in our analysis as to what custody arrangement was in Corey's best interests. This analysis is discussed in point 8 below.

### (3) *The Relocation Guideline Factors of* Gruber v. Gruber *Were Not Misapplied to This Custody Matter*

Mother asserts that we misapplied the *Gruber* factors to this relocation case. However, she is not specific as to what factors or how they were misapplied. These factors are as follows:

(1) The court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children.

(2) The court must establish the integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it.

(3) The court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the noncustodial parent.

Most *Gruber* relocation cases involve a primary custody parent who wishes to move and a partial physical custody parent. We note that in *Clapper v. Harvey,* 716 A.2d 1271 (Pa. Super. 1998), the Superior Court has extended the application of the *Gruber* factors to a case in which the partial physical custody parent sought primary physical custody and also sought to relocate. In *Clapper,* the court stated:

"*Gruber* factors should be considered in appropriate cases, as part of the overall best interests analysis, when a parent wishes to relocate a child to another jurisdiction. . . .

"The determination of a child's best interests involves the consideration of *all* relevant factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being. *Swope,* 455 Pa. Super. at 589-91, 689 A.2d at 265. It follows then that the factors outlined in *Gruber,* if deemed relevant and likely to affect the child's physical, intellectual, moral and spiritual well-being, should also be applied and considered in any custody case involving the relocation of either the custodial or non-custodial parent." *Id.* at 1274. (emphasis in original)

In the context of a best interest of the child analysis,[3] we considered these *Gruber* factors to the extent they were relevant in this relocation case involving two equal custodial parents. In this case we found:

(1) There was no dispute that it was to Mother's advantage to move to Hawaii to be with her husband in 1999. There was also no suggestion that Father could move to Hawaii. Father, like Mother, has lived in eastern Pennsylvania his entire life. His job as well as his immediate and extended family are in this area.

(2) Mother's motives in moving to Hawaii were to join her husband. It is to be noted that Mother originally created this problem when in 1994 she chose to marry a man in the military who was stationed in Hawaii. She knew it was possible he could be transferred back to

---

3. The best interest analysis is discussed more fully in point 8 below.

Hawaii. Father's motive in wishing to retain custody of Corey in Pennsylvania was not disputed. This motive was the close bond and love he has for Corey.

(3) The issue of realistic substitute "visitation" arrangements was considered. One parent would have summer and Christmas. One parent would have the school year. Mother does not work outside the home. If she had the school year, her time would be limited to that part of the day when Corey was not in school. By having the summer and Christmas vacation, Mother has the maximum time when Corey is not in school. Further, if Father had the summer, Corey would be in a child care situation during the day. We chose the arrangement which would help maximize the time Corey has with each parent given their respective occupations. We found it in Corey's best interest to attempt to provide him as much time as possible with each parent under the circumstances.

### (4) *The Trial Court Did Not Err With Respect to the Joint Custody Status in the CCES Report*

Mother asserts that we placed "undue and improper weight on the conciliator's request to Mother that she provide as much contact between Father and child prior to the child relocating to Hawaii, thereby resulting in the court determining that Father had joint physical custody of the minor child. . . . Mother is referring to the portion of the CCES report in which Ms. Friedman states as follows:

"The parties agreed to a shared custody schedule until the mother's move in order to enable Cory (sic) to spend as much time as possible with each parent."

We considered that the parties agreed that at least from the time of their last joint meeting for the custody evalu-

ation, they would have joint physical custody. This last joint meeting was March 1, 1999. We did not take this agreement to mean that the parties agreed that prior to the CCES evaluation, which began in January 1999, that they had joint physical custody. We made our determination that the parties had joint physical custody since 1995 from the testimony presented at trial. This is discussed in point 5 below.

### (5) *The Trial Court Did Not Err in Determining That the Parties Had Joint Physical Custody*

In this point, Mother asserts as follows:

"The trial court's determination that Father had a joint physical custody with Mother was contrary to the evidence, and the report of court conciliator, and was arbitrary and an abuse of discretion."

We determined that the parties had had joint physical custody from the evidence at trial. Father testified that he had had equal time with Mother at least from the time after Corey's return from Hawaii.

"Q. And when Corey came back from Hawaii to live in this area, how much time has Corey spent overnight at your residence for the time he came back from Hawaii until today?

"A. Approximately half the time." (N.T., p. 32.)

He noted that he had begun to keep records and that in the last two years, Mother had only seven nights more than he did. His testimony was as follows:

"Q. In the last two years, how much time has Corey spent with you as compared to Mrs. Taylor-Moreland?

"A. Once again, approximately 50 percent of the time in the last two years.

"Q. In the last two years, do you know how many days more overnight Corey spent with Mrs. Taylor-Moreland than he did with you?

"A. Yes. I chronicled it. It was seven days more with her than me." (N.T., p. 44.)

On cross, again examined on this issue, Father testified as follow:

"Q. I'm curious if that was the situation. I mean, you've sat here and testified virtually for the past 10 years you've had exactly half of the time with your son. Why would that even need to be said?

"A. Well, first of all, I didn't say for the past 10 years. When he was younger, like I said, I—I worked, you know.

"Q. You were working but she chose—

"A. She stayed at home. But for the past—certainly since she's come back from Hawaii, yes, that's been—that's been the case. So we've—the reason why was because we've never had a problem up until now. And my personal opinion—and this is only my personal opinion—I believe since Darlene's husband's in the military and she knew they were getting ready to leave, you know, since—with that surrounding, there's tension because of you know, is he going to be able to go or is he going stay, and that's understandable." (N.T., p. 69.)

He was extensively cross-examined on this issue and responded appropriately regarding details. For example, it was Mother's position that Father did not have Corey for any overnights during the week prior to Father's marriage in November 1997 because of Father's work hours. Mother asserted that Father's wife's work schedule enables her to take Corey to school at about 8 a.m. Mother testified that prior to November 1997, Father did not have Corey overnight during the week because Fa-

ther had to be at work at 7 a.m. However, Father testified that he would drop Corey off at the daycare center at the school at approximately 6:30 a.m. on his way to work. (N.T., p. 62.) We found Father's testimony credible.

Mother testified that she has always had primary physical custody even before the CCES evaluation. She acknowledged that Father has always had significant time with Corey. In most of her testimony, she was not definite as to what time he did have. We did not find Mother's testimony credible on the issue of primary physical custody.

Mother also states that our determination that the parties had joint physical custody was contrary to the conclusion of Ms. Friedman. We agree. However, implicit in this contention is the assumption that we must follow the conclusion of Ms. Friedman. We disagree. We find this contrary to the law and the function of courts.

In custody, in general, it has become common for a psychologist to evaluate the parties and to make a recommendation as to an appropriate custody arrangement. In many situations, this avoids the necessity of a custody trial, as the parties will reach agreement. However, in the event of a custody hearing, the custody determination is made by the court, not by the psychologist.

If the parties in a custody dispute privately retain a psychologist, that psychologist may testify and be cross-examined at the time of the custody hearing.

In Bucks County, we have created another option which is more financially feasible for most parties involved in a custody dispute. This is a system under which the parties may agree to go to the court conciliation and evaluation service (CCES) for a custody conciliation and evaluation. Under this system, an evaluation is made at

considerably less cost than if the parties retained a private psychologist. Prior to going to such evaluation, the parties sign a consent and waiver.[4] They waive the right to bring the evaluator to court. This form also states:

"I understand that if an agreement is not reached between us, a report based on the clinician's evaluation will be sent to the court and that the court's final decision in this matter may take into consideration the findings and recommendations in that report."

At the time of trial, we incorporated by reference into the record the CCES report authored by Ms. Friedman. (N.T., p. 3.) The issue of the past custody arrangement of the parties was addressed in various sections of the March 30, 1999 report as follows:

"The current arrangement for custody and visitation places Cory (sic) in the mother's primary custody. The father has partial custody Tuesday and Thursday overnight until school the following morning, and on alternate weekends from Friday evening until Monday morning. This has been an informal agreement since October 1998. Prior to that, the parents informally arranged partial custody." (Report, p. 1.)

"The mother says that she has been the child's primary caretaker, and that the father only became more involved with Corey when he married. She says that, prior to the father's marriage, 'he lived a single lifestyle,' and he would take the child when it was convenient for him." (Report, p. 2.)

"It is my impression that, although the father was consistently involved with the child, the mother was the child's primary parent. The father takes umbrage when

---

4. This consent and waiver form is part of the record on appeal.

the mother tells him that she was 'the primary parent and he was a Disney Dad.' " (Report, p. 4.)

"The father takes his parenting responsibility seriously and views his role in the child's life as being as significant as the mother's is. It is my impression that this makes it difficult for him to confirm that the mother was the primary parent." (Report, pp. 4-5.)

"It is my professional opinion that the mother has provided primary custody of the child and, if the court grants her request to relocate with Cory (sic) to Hawaii, she should continue to provide primary custody for him." (Report, p. 5.)

Before we address the issue of the evaluator's conclusion that Mother had primary physical custody prior to the CCES evaluation, we note that Ms. Friedman concluded that Mother at present had primary physical custody and that Father at present had partial physical custody under the informal custody arrangement in place since October 1998. However, an examination of the actual time indicates that on a 14-day schedule, each parent has seven days. This is an equal physical custody schedule. Ms. Friedman is incorrect when she stated on page 1 of her report that "The current arrangement for custody and visitation places Cory (sic) in the mother's primary custody." This is, of course, the arrangement acknowledged to be in place since October 1998, prior to the CCES evaluation.

It was this court's impression at trial that the label of primary physical custodian was very important to Mother. Father was not as concerned with the title but rather focused more on the actual time. This difference in approach may help explain, to some extent, discrepancy in the testimony of the parties on this point.

Mother's statement that Father only became more involved with Corey after his marriage in November 1997, is contradicted by Mother's testimony at trial that Father wanted Corey for six months or half of the time when Mother went to Hawaii in 1994. We considered this issue in connection with our determination that Father would more likely foster contact with Mother as described in point 7 below.

Finally, it is clear that Father did not agree with Mother at the time of the evaluation that Mother was the primary custodian after her return from Hawaii in 1995. The evaluator reached that conclusion and relied upon it in forming her conclusion that Mother should have primary custody. However, this report represents the opinion of an expert and is subject to the same limitations as any expert testimony. If the trier of fact finds that a material fact that the expert relied upon in reaching her conclusion does not exist, then the opinion so expressed should not be considered by that trier of fact. (See *In re Glosser Brothers Inc.,* 382 Pa. Super. 177, 555 A.2d 129 (1989).) Ms. Friedman assumed that Mother had had primary physical custody at all relevant times. We found from the evidence at trial that this was not correct.

It is the function of the trial court to assess credibility of the parents. We specifically found at the end of the hearing on the record that Ms. Friedman's conclusion that Mother had primary physical custody was not correct. (N.T., p. 176.) We did note at that time, however, that for the first few years of Corey's life, his Mother had been his primary custodian, although he had significant contact with his Father. We found that by the time of the return from Hawaii in November 1995 through the present, the parties had equal physical custody. (N.T.,

p. 176.) Therefore, we did not consider Ms. Friedman's recommendation as to the custody arrangement to have any validity or weight. We did find her report useful as to Corey's position on custody and information on the parties.

## (6) *The Trial Court Did Not Err in Separating Corey With His Two Half Sisters, One of Whom Was Yet Unborn at the Time of the Trial*

The fact that Corey had a 3-year-old half sister at the time of trial was considered by this court as well as the probability that there would be another half sibling shortly after the hearing. By this point raised on appeal, we gather that Darlene Taylor-Moreland had a baby girl. The only testimony we heard concerning the relationship of this 10-year-old boy and his 3-year-old half sister was from Mother. She testified that they fight, then added that they love each other. (N.T., p. 138.) We did not consider such relationship to be of such magnitude so as to necessitate Corey remaining with his sisters for the school year. He will see them each summer and Christmas vacation. We note that Father's wife is pregnant with an anticipated delivery date in January 2000. Presumably, Corey will have another half sibling from his father's side. The issue of siblings to the extent that it is a factor at all is approximately equally weighted on both Mother and Father's sides.

## (7) *The Court Did Not Err in Determining That Father Would More Adequately Facilitate a Partial Custody Arrangement*

In this point, Mother asserts that we determined that Father would more adequately facilitate a partial cus-

tody arrangement based upon an incident at Christmas 1994. We disagree. The issue of facilitating a partial custody arrangement arose in the context of a statement by Ms. Friedman in the CCES report. In this report, Ms. Friedman states: "It is my impression that the mother recognizes the importance of the father's relationship with Corey and she will make every attempt to insure that the child is able to spend time with his father." (Report, p. 5.) We indicated that that statement should be qualified because of two incidents. (N.T., p. 177.) The incident at Christmas or rather January 1995 was one of these two incidents. The other incident involved the agreement the parties reached prior to Mother leaving for Hawaii in 1994 and her failure to abide by that agreement. We will discuss each of these incidents briefly.

The January 1995 incident involved a dispute between the parents as to whether Corey was going to go with Father that day. Mother wanted Corey to go to some event at her mother's. Father said he would make sure Corey was brought to the event. They disagreed on the time. It apparently was one of the few times when they disagreed about this topic. The significance for this court was that when Father said he was coming over to pick up Corey, Mother called the police. In the end, Father was about to pick up Corey, but the police were there. (N.T., pp. 35-39.) This was not an appropriate atmosphere for Corey.

The Hawaii incident involved the intention of the parties at the time Mother went to Hawaii in May 1994. She had married her present husband in April 1994. Mr. Moreland had been stationed in Hawaii for four years. A usual tour of duty is five years. It was anticipated that the family would be transferred back in approximately one year. In fact, they did return in November 1995. Fa-

ther testified that the agreement was that he would have Corey for six months or approximately one half the time, beginning in January 1995. He planned to enroll Corey back in his Pennsylvania school. After Mother and Corey returned to Pennsylvania in November 1995 they would have to work out the exact times for the custody arrangement but it was to be equal time.

Mother denied this agreement as to the six-month arrangement. However, she was not consistent in her testimony. She did acknowledge that she did intend to send Corey back for two months in January 1995, but then she discovered she was pregnant. She then decided to keep Corey with her for the birth of her child. (N.T., pp. 151-52.) Mother took this step even though Corey missed his father. Further, Mother acknowledged that Father then agreed to only keep Corey for two months but she did not send him. (N.T., p. 152.) Father's mother also testified with great credibility that Mother told Father in her presence that he would have six months. (N.T., p. 84.) We found that Mother did not consider how important it was for Corey to have time with his father.

On the other hand, there was no dispute or incident to indicate that Father would not facilitate contact with Mother.

### (8) *The Trial Court's Decision To Award Father Primary Physical Custody of the Minor Child During the School Year Was in the Child's Best Interests*

This custody case involves the relocation of one of two parents who have equal custody. Therefore the basic premise of the *Gruber* case is not applicable to such a situation. In *Gruber,* the court states:

"In terms of the best interests of the child the primary physical custody family must be viewed as the family central and most important to the child's best interests. . . .

"Therefore, our analysis begins with the recognition that divorce causes irrevocable changes in parent-child relationships. Further, we emphasize that the best interests of the child are more closely allied with the interests and quality of life of the custodial parent and cannot, therefore, be determined without reference to those interests. In the context of relocation cases this principle translates into an understanding that when relocation is likely to result in a substantially enhanced quality of life for a custodial parent, often the child's best interests will be indirectly but genuinely served." *Gruber* at 182-83, 583 A.2d at 438. (footnote omitted)

The assumption in the *Gruber* line of cases is that if the relocation is of benefit to the primary physical custodian,[5] then it will benefit the child. That assumption is absent when both parents have equal physical custody. We therefore looked to a best interests analysis of the child. To the extent that any factors raised in the *Gruber* relocation cases were relevant, we considered them in the context of a best interests analysis. As the court stated in *Gancas v. Schultz,* 453 Pa. Super. 324, 331, 683 A.2d 1207, 1210 (1996), the factors in *Gruber* are "refinements of the basic standard which remains the best interest of the child."

A "best interests" analysis involves consideration of the physical, emotional, intellectual and spiritual well-

---

5. Or in the case of *Clapper,* the parent who seeks primary physical custody and then to relocate.

being of the child. *Swope v. Swope,* 455 Pa. Super. 587, 689 A.2d 264 (1997). The CCES report found that, "The parents are able to co-parent. They are mature, caring individuals who both take their parenting responsibilities seriously. . . . The father is an involved, caring parent with excellent parenting skill . . . The mother also has a close relationship with the child, and has excellent parenting skills. (Report, pp. 4, 5.)

In his interview with Ms. Friedman, Corey was "asked a series of hypothetical parenting situations to determine if (he) showed preference for one parent, Cory (sic) showed no preference, and looked to either parent to meet his physical and emotional needs. It was evident to me that Cory (sic) would like the situation to remain as it has been so that he would continue to have access to each parent. (Report, p. 4.)

Corey is doing well in school. He is an "A" student. He is active in sports, including football, basketball and karate. He has frequent contact with his extended family in Pennsylvania. When he went to Hawaii in 1994 when he was 6 years old, he missed his father. Corey has suffered the loss of sustained contact with his father in the past. We did not feel that it was in his interest for this almost 11-year-old boy to again suffer the loss of constant contact with his father.

A review of the totality of the testimony at trial and the demeanor of the parties led us to conclude that Mother was more focused on her needs and interests. Her decision to marry and relocate Corey the last time was not to Corey's benefit; it was to her benefit. Father appeared more focused on Corey's needs.[6] For example, he spoke

---

6. There is no dispute that Father has faithfully paid an agreed upon amount of child support without a court order since Corey was a baby.

of Corey's interest in sports and various scenarios for school and sports based on Corey's desires and needs in the next few years. (N.T., pp. 45-46.) Mother's testimony on this issue consisted principally of repeating simply that Corey should be with her.

Corey should suffer as few losses as possible occasioned by this current move of Mother's. He will lose the constant contact of one parent, either Mother or Father. If he goes with Mother, he also loses contact with his father, his school, his extended family, his friends with whom he plays sports, and the home in which he currently spends half his time. If he goes to Hawaii, he will be with his mother, his 3-year-old half sister and his newborn baby half sister far from his familiar surroundings, friends and relatives. We found it in Corey's best interests for him to be with his father for the school year and with his mother in the summer and at Christmas. For the above reasons, we entered our order of May 28, 1999.