## Collins *v.* Hand, Appellant.

Argued May 2, 1968.  Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Frank Bielitsky,* for appellant.

*Benedict A. Casey,* with him *James E. Beasley,* and *Beasley, Albert, Hewson & Casey,* for appellee.

OPINION BY MR. JUSTICE JONES, October 3, 1968:

Julia Collins, suffering from an extreme nervous condition, entered Hahnemann Hospital, Philadelphia, on October 27, 1959, on the service of Dr. J. B. Donaldson. Dr. Donaldson, deciding that her condition required psychiatric care, called in Dr. B. Marvin Hand, a Board certified psychiatrist and neurologist.

After an examination of Miss Collins, Dr. Hand concluded that she was suffering from agitated depression[1] and he recommended that she submit to electroshock treatments. Since Hahnemann Hospital was not equipped to administer these treatments, Miss Collins was transferred upon Dr. Hand's suggestion, to Eugenia Memorial, Incorporated (Eugenia), a private psychiatric hospital.

Miss Collins was admitted to Eugenia on October 30, 1959. The first electroshock treatment was administered[2] the next day with no untoward incidents occurring. However, during the next treatment, ad-

---

[1] Miss Collins was diagnosed as a manic depressive.

[2] Electroshock therapy at Eugenia is normally administered by a shock team under the supervision of three doctors each working alternately. The first treatment was administered to Miss Collins under the supervision of Dr. H. W. Lohmuller and the second treatment under Dr. H. F. Boerner, Jr.

ministered November 2, 1959, "there was a cracking sound of [her] lower extremities". It was later determined that Miss Collins suffered bilateral fractures of the acetabulae.[3] These injuries have resulted in considerable limitation in her hip necessitating use of a cane. Later, Miss Collins, while at her niece's home, sustained an ankle injury from a fall allegedly caused by this limited hip movement.

Miss Collins instituted this trespass action in Court of Common Pleas No. 6 of Philadelphia County against Dr. Hand and was awarded a verdict in the amount of $40,000. Motions for judgment n.o.v. and for a new trial having been denied by the court en banc, judgment was entered on the verdict and this appeal followed.

Dr. Hand's liability is predicated on two alternative theories: (1) that he was guilty of personal negligence or (2) that he was responsible for the negligence of Eugenia's employees in administering the electroshock therapy. Dr. Hand contends that the evidence presented at the trial is totally insufficient to hold him liable upon either of these bases.

Within the background of Dr. Hand's appeal, we must remember that in disposing of a motion for judgment n.o.v., the evidence together with all reasonable inferences therefrom must be considered in the light most favorable to the verdict winner and the grant or refusal of a new trial will not be reversed on appeal, absent an abuse of discretion or error of law which controlled the outcome of the case. See: *Connolly v. Philadelphia Transportation Co.*, 420 Pa. 280, 216 A. 2d 60 (1966); *Schwegel v. Goldberg*, 209 Pa. Superior Ct. 280, 228 A. 2d 405 (1967).

---

[3] The acetabulum is the socket located in the hips into which the ball-like head of the femur fits. Fractures were sustained in both sockets.

Personal Negligence of Dr. Hand

Considerable case law of our Court has dealt with the standard of care required of a physician. In the absence of a special contract, a physician is neither a warrantor of a cure nor a guarantor of the result of his treatment. The plaintiff in a malpractice action must prove either that (1) the physician did not possess and employ the required skill and knowledge or (2) that he did not exercise the care and judgment of a reasonable man in like cases *and* that the injury complained of either (1) resulted from the failure on the part of the physician to possess and employ the required skill and knowledge, or (2) resulted from his failure to exercise the care and judgment of a reasonable man in like circumstances. See: *Donaldson v. Maffucci*, 397 Pa. 548, 156 A. 2d 835 (1959); *Hodgson v. Bigelow*, 335 Pa. 497, 7 A. 2d 338 (1939); *Wohlert v. Seibert*, 23 Pa. Superior Ct. 213 (1903); *Richmond v. A. F. of L. Medical Service Plan of Philadelphia*, 421 Pa. 269, 218 A. 2d 303 (1966).

As a matter of proof in malpractice cases, there is no presumption or inference of negligence merely because a medical procedure terminated in an unfortunate result which might have occurred despite the exercise of reasonable care. This is especially so where the treatment and injury involved are such that common knowledge or experience of laymen is not sufficient to form the basis for passing an intelligent judgment. In such cases, expert testimony in support of the plaintiff's claim is an indispensable requirement to establish a right of action. *Robinson v. Wirts*, 387 Pa. 291, 127 A. 2d 706 (1956); *Hodgson v. Bigelow*, 335 Pa. 397, 7 A. 2d 338 (1939); *Demchuk v. Bralow*, 404 Pa. 100, 170 A. 2d 868 (1961).

In dealing with the problem of the cause of fractures during electroshock therapy, courts from other

jurisdictions have consistently held that *res ipsa loquitur* is not applicable. This is attributed to the fact that fractures are a recognized risk of electroshock therapy. See: *Johnston v. Rodis,* 102 U.S. App. D.C. 209, 251 F. 2d 917 (1958); *Farber v. Olkon,* 40 Cal. 2d 503, 254 P. 2d 520 (1953); *Quinley v. Cocke,* 183 Tenn. 428, 192 S.W. 2d 992 (1946).

Miss Collins first claims that Dr. Hand was negligent in failing to take or read X-rays which would have disclosed to him that she suffered from osteoporosis.[4] This condition and its extent can be determined through the use of an X-ray of the chest or dorsal region of the spine. Prior to administering electroshock therapy, a "routine workup" is prepared, usually by an interne, to determine the patient's physical fitness to undergo the therapy and part of this workup consists of X-rays. In Miss Collins' case, X-rays were taken at Hahnemann and a report furnished to Dr. Hand which indicated Miss Collins was suffering from emphysema but there was nothing, it appears, in the report that Miss Collins suffered from osteoporosis. Dr. Hand admitted he did not read the X-rays.

Appellee thus argues that Dr. Hand failed to avail himself of the scientific means at his disposal and, as a result, failed to fully apprise himself of the risks which would accompany the use of electroshock therapy.[5]

It is reasonably clear that Dr. Hand acted improperly in this situation. He was bound to use the skills he possessed or should possess as a psychiatrist and,

[4] Osteoporosis is a demineralization of the bone structure causing a concomitant weakening of the bones and is a condition normally found in aged people. Miss Collins was approximately 74 years of age at the time she underwent the electroshock therapy at Eugenia.

[5] The testimony of the various physicians indicated that osteoporosis would make the bones more susceptible to fractures.

in these cases, a pre-therapy routine is normally involved which consists of proper appraisal of the patient's physical condition.

However, assuming Dr. Hand's negligence in this respect, something more is required before he may be held liable for the fractures and other injuries resulting therefrom. In these cases as well as in other negligence cases the principle is established beyond question that the alleged negligence must have caused the injuries complained of before recovery may be had. See: *Fye v. Sharp,* 319 Pa. 545, 181 A. 510 (1935); *Richmond v. A. F. of L. Medical Service Plan of Philadelphia,* 421 Pa. 269, 218 A. 2d 303 (1966); *Donaldson v. Maffucci,* 397 Pa. 548, 156 A. 2d 835 (1959); *Wohlert v. Seibert,* 23 Pa. Superior Ct. 213 (1903). See also *Barber v. John C. Kohler Co.,* 428 Pa. 219, 237 A. 2d 224 (1968).

An examination of the record fails to disclose any adequate basis for the conclusion that Dr. Hand's failure to take or read X-rays to determine the existence of the osteoporotic condition of Miss Collins caused the bilateral acetabular fractures. Moreover, appellee's own expert witness[6] testified "when the machine is used with the glissando[7] and there is no restraint, then even in the case of a person who has osteoporosis, the possibility of a fracture is very small. The possibility of a bilateral fracture is almost impossible." It is to be noted that this witness did not testify that

---

[6] Dr. Herman Kurt van der Meer, a Board certified psychiatrist, testified on behalf of Miss Collins that the fractures were caused by improper restraint of her legs during the second electroshock treatment.

[7] The glissando is part of the electroshock equipment and is used to cause slow application of electricity to the patient's body in order to prevent a sudden jolt of the body. This device was part of the equipment at Eugenia when the therapy was administered to Miss Collins.

it was improper medical practice to have electroshock therapy administered to Miss Collins. He further stated that the osteoporosis in this patient was "the average of what is usually seen at the age of seventy-three." Dr. Tomasco and Dr. Klinghoffer, both testifying for appellee, expressed the opinion that the extent of her osteoporosis was normal for her age. Dr. Samuel B. Hadden, Board certified psychiatrist and neurologist, testified for Dr. Hand that electroshock therapy is recognized treatment for manic-depression, that fractures are a recognized risk of such therapy and that neither old age nor osteoporosis contraindicates the administration of such therapy. Dr. Deichelmann,[8] also testifying for Dr. Hand, opined that the acetabular fractures occurred as a result of equal bilateral muscular reaction which pulled the hip bones on either side with such force that the acetabulae were fractured. He stated his experience was such that fractures did occur and it is impossible to predict when the muscles will react in such a manner as to cause fractures. Appellee relies heavily on Dr. Deichelmann's testimony that this muscle contraction can be prevented if a muscle relaxant is used. However, Dr. van der Meer testified that the muscle contraction caused by application of electrical impulses is itself part of the treatment.[9]

---

[8] Dr. Deichelmann is a psychiatrist, although not board certified, and at the time of trial had been administering electroshock treatments since 1940.

[9] Specifically Dr. van der Meer stated: "Then, to follow through, if it were possible to administer electroshock treatment without any contraction, it would be an advantage if the same effect could be obtained by applying an electric current and no convulsions or tonic contractions would occur and nevertheless the depression would be cured. It would even be an advantage; so, I mean the physical manifestation of clonic contraction in itself is part of the treatment."

Summarizing the foregoing testimony, while we find disagreement as to the *real cause* of the fractures, one thing is very evident: none of the experts testified that the mental condition of Miss Collins did not warrant electroshock therapy[10] nor did any expert testify that her osteoporotic condition mitigated against use of such therapy. Indeed, it is fairly obvious that appellee's whole theory of the cause of the acetabular fractures was the application of too much restraint on her legs during the electroshock therapy by the shock team at Eugenia and the testimony elicited from her own witnesses was calculated to minimize the effect of the osteoporosis. On this state of the record, then the verdict, if based on Dr. Hand's alleged negligence in

[10] Dr. Hand testified that two principal reasons for advising electroshock therapy in Miss Collins' case was because her mental condition could cause an elevation in her blood pressure which he found to be high and which could have resulted in a vascular accident; secondly, he felt that in her depressed state she may have attempted suicide. It is argued that Miss Collins' blood pressure was only taken three times showing no real concern on this point and when she was admitted to Eugenia her pressure actually lowered. However, at the time of her admission to Eugenia, the reports show two different blood pressure readings, one of which was very high. At any rate, Dr. Hand explained that Miss Collins' high blood pressure was *only one* of the factors he considered in deciding upon her course of treatment. As to the risk of suicide, appellee argues from the testimony of Dr. van der Meer that suicide is only a risk to a manic-depressive who is psychotic and nowhere is there any testimony that Miss Collins was psychotic. Further, it is argued that Dr. Hand admitted there was no *immediate* risk of suicide. We agree that there was no showing of *immediate* risk of suicide, but this was not the problem. Concern was over the possibility of suicide. Furthermore, manic depression actually is *a* psychosis. See: Hinsie and Campbell, Psychiatric Dictionary, 3d ed. (1960). Moreover, Dr. van der Meer himself testified that electroshock would considerably shorten the hospitalization of a *manic-depressive* and, as previously noted, Dr. Hadden also testified that electroshock treatment is standard treatment for a "manic-depressive state, agitated."

having electroshock therapy initially administered, would have to be mere guess or conjecture. Cf. *Barber v. John C. Kohler Co.*, 428 Pa. 219, 237 A. 2d 224 (1968).

Secondly, the alleged personal negligence of Dr. Hand is based on the fact that Dr. Hand failed to order X-rays of Miss Collins to discover the fractures until November 5, 1959, three days after the second electroshock treatment was administered. The X-rays were taken November 6 and an X-ray report dated the same day. However, Dr. Hand was not notified until November 11, 1959. Appellee argues that complaints by Miss Collins put Dr. Hand on notice that fractures may have occurred and he should have ordered X-rays immediately, and, further, after the X-rays were taken he should have sought to apprise himself of the results instead of waiting for hospital personnel to notify him.

On this specific issue there was no expert testimony that it was improper medical practice for Dr. Hand to have failed to have X-rays taken. In *Smith v. Yohe & Gailey*, 412 Pa. 94, 194 A. 2d 167 (1963), we held that failure to take X-rays as an aid in diagnosis was negligence under the particular facts of that case absent expert testimony. *Smith* is somewhat similar to the case at bar. In *Smith*, the plaintiff was a seventy year old man convalescing from a stroke when he slipped and fell; the defendant doctor was summoned but he failed to order X-rays; X-rays were finally taken eleven days later but by that time the patient's leg was completely paralyzed. But, in the instant case, as Dr. Hand very aptly points out, X-rays would be helpful only as an aid to diagnosis. Dr. Hand, suspecting fractures, manipulated Miss Collins' legs to determine the existence of any paralysis but found none. He ordered robaxin and tofranil[11] on Novem-

---

[11] Robaxin is a muscle-relaxant and is administered to prevent spasm of the muscles. Tofranil is an anti-depressant drug.

ber 5. Dr. Tomasco, who later treated Miss Collins for the fractures, testified that this was proper treatment. He also said: "A. As I tried to explain, in this particular type of fracture, we were mostly interested in the soft tissues that surround the hip joints. We were not too interested—I found there was no locking, or there were no lockings into the hip joints that would require surgery, so that all the treatment was diverted to the soft tissue. This woman showed she had motion in her hip joints, and when it developed that she had muscle spasm, it was mostly training her to walk. We were not too interested in the callus formation." Dr. Tomasco also testified that there was no indication her condition worsened from the time the fractures were sustained until he was called into the case.

We must conclude, then, as a result of the testimony and the applicable principles of law, that the evidence was totally insufficient to support the verdict against Dr. Hand on the basis of *his own* negligence.

## Vicarious Liability of Dr. Hand

Appellee's success under this theory of liability requires initially, proof of negligence on the part of the shock team at Eugenia in its administration of the second electroshock treatment. The only proof of negligence on the part of the shock team was the opinion expressed by Dr. van der Meer that too much restraint had been applied to Miss Collins' legs during the treatment and that such restraint was improper medical practice in 1959.

An examination of the record, however, discloses not even a scintilla of evidence that Miss Collins' legs were restrained during the course of the second electroshock treatment.[12]

---

[12] Dr. Boerner described the normal procedure involved when electroshock therapy is given at Eugenia: "Q. You say you are sta-

An expert cannot base his opinion upon facts which are not warranted by the record. No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture. *Smail v. Flock,* 407 Pa. 148, 180 A. 2d 59 (1962); *Murray v. Siegal,* 413 Pa. 23, 195 A. 2d 790 (1963). Cf. *DeFrank v. Sullivan Trail Coal Co.,* 425 Pa. 512, 229 A. 2d 899 (1967). In *Dreher v. Order of United Commercial Travelers of America,* 173 Wis. 173, 180 N.W. 815, 817 (1921), the Court stated: "It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. The opinion must be an intelligent and reasonable conclusion, based on a given state of facts, and be such as reason and experience have shown to be a probable resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. *In other words, the opinion of the expert does not constitute proof of the exist-*

---

tioned behind the head of the patient or top of the head? A. Yes, I am at the head of the bed, and there is an attendant on either side approximately at the chest of the patient . . . . Q. What do the aides do? What are they directed to do? A. One of the aides is directed to insert the rubber mouthpiece and hold the jaw firmly so that the mouthpiece cannot be pushed out and also to hold cotton on the arm, where I have injected the medication. The other aide has her hand on the shoulder and the other hand on the hand or head of the patient, depending." Mrs. Laura Buccino, a registered nurse in charge of the electroshock treatment room at Eugenia in 1959, testified: "Q. When the patient, particularly Julia Collins, was on the bed, was she strapped down by any straps or anything like that? A. No. We never applied any straps. Q. Were there any canvas straps or restraints upon her person? A. No straps were applied. Q. With respect to her extremities, were they held down or restrained in any fashion? A. No."

*ence of the facts necessary to support the opinion."* (Emphasis added).

In the case at bar Dr. van der Meer's opinion assumes (1) that restraints were applied to Miss Collins' legs and (2) that "this" restraint was "too much". On the state of the record this testimony can only be classified as mere guess or conjecture and "would be to build a presumption on a presumption, which would build a smoke ladder into the skies of irresponsible speculation, which, fortunately, the law prohibits." *Auerbach v. Philadelphia Transportation Co.*, 421 Pa. 594, 602, 221 A. 2d 163 (1966).

Lacking evidence of negligence on the part of Eugenia's shock team, no support can be found for a finding that Dr. Hand is vicariously liable for Miss Collins' injuries.

Since the admission of Dr. van der Meer's opinion was error and would warrant a new trial, we will assume for the purposes of Dr. Hand's motion for judgment n.o.v. that Eugenia's shock team was guilty of negligence in the course of the electroshock treatment of November 2, 1959.

We, then, reach the question whether Dr. Hand can properly be held liable under the doctrine of *respondeat superior* for negligence of Eugenia's shock team.

This Court has many times considered and held applicable the principles of *respondeat superior* to physicians even in situations where the alleged servant was an employee of a hospital and even where the servant was of the same profession. See: *McConnell v. Williams*, 361 Pa. 355, 65 A. 2d 243 (1949); *Yorston v. Pennell*, 397 Pa. 28, 153 A. 2d 255 (1959); *Rockwell v. Stone*, 404 Pa. 561, 173 A. 2d 48 (1961); *Rockwell v. Kaplan*, 404 Pa. 574, 173 A. 2d 54 (1961).

In *McConnell*, this Court speaking through Mr. Justice (later Chief Justice) HORACE STERN, espoused the "captain of the ship" doctrine and applied it to

operating surgeons. In holding the operating surgeon liable for an interne's negligence in applying a solution to the eyes of a newborn child causing loss of one eye and severe injury to the other, we said (p. 362) : "And indeed it can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation, . . . he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board, and that such supreme control is indeed essential in view of the high degree of protection to which an anaesthetized and unconscious patient is entitled . . . ." In *Yorston,* supra, a physician was held liable for the acts of certain hospital employees and a resident physician which resulted in the administering of penicillin to a patient who was allergic to the drug. *Rockwell v. Stone* involved the personal and vicarious liability of an anesthesiologist for injuries caused by the improper administration of anesthesia.

Appellee as well as the court below places primary reliance upon *Rockwell v. Kaplan,* supra, which presented the same identical factual background as in *Rockwell v. Stone.* Rockwell sought to fasten liability upon the operating surgeon, Dr. Kaplan, for the negligence of the anesthesiologist, Dr. Stone, on the theory of *respondeat superior* and this Court found Dr. Kaplan liable. Appellee argues that Dr. Hand arranged for Miss Collins' transfer from Hahnemann Hospital to Eugenia; that he was the only attending physician and the only doctor who wrote orders for drugs and other care; that it was on his order that electroshock therapy was initiated and stopped; that he was notified of the fractures and the hospital waited his orders; that he was qualified to give electroshock therapy; and received an economic benefit from his relationship with Eugenia. On those facts appellee claims our

prior case law, especially *Kaplan,* dictates holding that Dr. Hand is vicariously liable for any negligence of the shock team.

We cannot agree with appellee. *Kaplan* involved a situation where this Court found the operating surgeon was the "boss" of the operation and that administration of the anesthesia was an integral part of that procedure. The Court, quoting from *McConnell v. Williams,* supra, said: " 'But for the period of the operation itself the situation is entirely different, and, if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations.' "[13]

*McConnell* and *Kaplan* very clearly proceed upon the ground that complete control by an operating surgeon is indispensable if a high degree of protection is to be accorded to the anesthetized patient and he must be held liable for the negligence of those assisting him in performing the operation.

In this case we are faced with a totally different situation. Dr. Hand suggested Eugenia as a place where electroshock treatments could be administered to Miss Collins since they were not available at Hahnemann Hospital. At Eugenia, a group of employees headed by one specially experienced in shock treatments administered the therapy to Miss Collins. Dr. Hand did not choose the doctor who was to administer the therapy, as the defendant doctor did in *McConnell,* supra; nor did he hire, compensate nor could he discharge any of these persons.

It is important to note that Dr. Hand had not administered electroshock therapy since about 1946. Because of this fact and because of new techniques and

---

[13] *Rockwell v. Kaplan,* 404 Pa. 574, at page 579.

his own position, he did not feel expert in the administration of electroshock treatments and he was not present when the treatments were given.[14]

The crucial test in determining whether an employee furnished to another becomes the servant of the one to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also as to the manner of performing it. *Mature v. Angelo*, 373 Pa. 593, 97 A. 2d 59 (1953).

It becomes very important to determine whether one has the right to control the manner of performance of the specific act in question which causes the injury and it is not sufficient to show merely that electroshock therapy was ordered and stopped by Dr. Hand. "Of course, anyone who engages the service of a technician or specialist for the performance of a particular job must of necessity indicate to him from time to time the work that he wishes done and for which he has engaged him; in accordance, however, with the foregoing statement of the applicable legal principle, the giving of such directions does not bring the hired servant into *his* employ and make *him* responsible for the *performance* of the work.": *Mature v. Angelo*, 373 Pa. 593 at pages 600-601.

Dr. Hand sought to obtain individuals skilled in the administration of electroshock therapy. He had not personally administered such treatments for a considerable length of time. He had referred patients to Eugenia for such therapy previously and, as in the case of Miss Collins, was not present nor directed the ac-

---

[14] *Yorston v. Pennell* is clearly inapposite. Although the doctor held liable in that case was not present during the whole operative procedures, the operating surgeon was lacking a surgical license and was required by law to be under the control and supervision of the defendant doctor. Also, consultations were held between both doctors, as to pre and post-operative procedures.

tual performance of these treatments. He had no control over the wages nor other terms of employment of the employees at Eugenia who administered the therapy. As a result, we cannot conclude he had any effective degree of control or the right to control the manner of performance of these treatments.[15]

Moreover, the type services herein involved brings this case squarely within the ruling of Powell v. Risser,[16] which held that a physician was not liable for the alleged improper acts of hospital employees in the application of wet packs to a mental patient. It was considered that such services were part of the normal nursing procedures rendered by the hospital for which the latter was exclusively responsible. In the case at bar, Eugenia, a private psychiatric hospital, had provided electroshock treatments which were not available at Hahnemann Hospital, as a normal part of its business. Miss Collins sustained her fractures during the administration of such services by a shock team provided by the hospital. It is clear that the shock team was acting exclusively on behalf of the hospital and not as servant of Dr. Hand.

From a consideration of the whole record, we are constrained to conclude that the evidence is totally insufficient to support the verdict against Dr. Hand either for personal malpractice or on the theory of respondeat superior.[17] As a result the lower court

---

[15] Cf. Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal. App. 2d 560, 317 P. 2d 170 (1957), where the court refused to impose liability on a physician for acts of members of the hospital staff who performed an aortography upon his order.

[16] 375 Pa. 60, 99 A. 2d 454 (1953).

[17] Since Dr. Hand is not liable for the condition of Miss Collins' hips, no recovery can be had for any damages resulting from her fall in 1962 even if the condition of her hips proximately caused the fall. Evidence of a subsequent injury is probative only if it relates back to a negligently caused injury. See: Restatement 2d, Torts, §460. Cf. Bender v. Welsh, 344 Pa. 392, 25 A. 2d 182 (1942).

erred in refusing to grant appellant's motion for a judgment n.o.v. In light of this result we need not consider the various trial errors assigned by Dr. Hand as support for a new trial.

Judgment reversed.

Mr. Justice MUSMANNO dissents.