## Stimmler v. Chestnut Hill Hospital

*Anastasia M. Buccino-Roth* and *Joseph L. Messa Jr.*, for appellant.

*Joann Giangiulio, Richard A. Kolb, Michael O'Connell Pitt* and *William Sutton,* for appellees.

TERESHKO, *J.,* April 7, 2005—

## I. PROCEDURAL HISTORY

This appeal by plaintiff Ann Stimmler arose as a result of this court's order granting defendants Chestnut Hill Hospital, Dr. Samuel Watterson, Dr. Walter Matteucci, and Dr. Padula's motions for summary judgment for failure to establish breach of the standard of care and causation.

## II. FACTS

On May 12, 1965, Ann Stimmler (plaintiff) presented to Chestnut Hill Hospital for the birth of her first child. (Third amended complaint, dated 9/18/03, ¶12.) The birth was uneventful and not an issue in this case. Several hours following the delivery of her baby, plaintiff went into peripheral circulatory failure (shock). This necessitated Dr. Anthony Padula to insert an IV catheter in plaintiff's right arm via an antecubital cutdown procedure[1] on May 13, 1965, and a left antecubital cutdown procedure in plaintiff's left arm on May 15, 1965. (*Id.* at ¶¶14-15.) Dr. Samuel Watterson, at the time a Family Practice Intern at Chestnut Hill, ordered the removal of the catheters from the cutdown procedures. Dr. Padula removed the right antecubital cutdown on May 15, 1965, and the left on May 16, 1965. (Dep. of Dr. Padula, dated 3/22/

---

1. This procedure involves cutting into a vein at the bend of the elbow on the inside of the arm to insert a catheter. After the catheter is removed, the cut is stitched shut, and a sterile dressing is applied.

04, pp. 35-38.) Plaintiff was discharged from Chestnut Hill Hospital on May 22, 1965.[2] (Third amended complaint, ¶16.)

Since May 1965, plaintiff has sought numerous medical treatments for circulatory and respiratory problems, and has been frequently treated with Coumadin. (Third amended complaint, ¶¶16-24.) These medical treatments include the placement of catheters into her body on no less than 16 separate occasions, excluding the cutdown procedures performed in May 1965. (Dr. Padula's request for admissions, dated 3/24/04.)[3]

On January 19, 2000, plaintiff underwent a transesophageal echocardiograph,[4] where it was observed that a fragmented "catheter-like" foreign body was coiled in the right atrium of her heart, passing into and through the right ventricle to the outflow tract. (Third amended complaint, ¶25.) On February 8, 2000, plaintiff underwent another echocardiogram, which confirmed the presence of a fragmented "catheter-like" presence in the right atrium and right ventricle. (*Id.* at ¶26.) Plaintiff alleged that this was one of the catheters used during her cutdown procedures in May 1965, and not the result of any of her 16 subsequent catheterizations. (*Id.* at ¶27.) The

---

2. Dr. Walter Matteucci, in response to plaintiff's interrogatories, stated that he played no role in the insertion or removal of plaintiff's catheters, and has neither performed nor witnessed any cutdown procedures.

3. Plaintiff generally denied any catheterizations during any of the hospital visits identified in Dr. Padula's request for admissions. This court is without sufficient evidence regarding the nature of the 16 procedures because plaintiff generally denied the requests.

4. An endoscopic/ultrasound test provides ultrasonic imaging of the heart from a retrocardiac vantage point.

fragmentation of the foreign device inhibits the possibility of its removal. Plaintiff further claimed that the presence of this "catheter-like" device, from the May 1965 procedure, was the cause of all of her hospitalizations for circulatory and respiratory problems since May 1965. (*Id.* at ¶30.) Plaintiff also alleged that, as a result of the presence of this fragmented foreign device, she will be on Coumadin for the remainder of her life. (Dr. DePace's expert report, dated 8/4/03, p. 1.)

Plaintiff subsequently commenced this medical malpractice action against defendants by filing a complaint on September 6, 2001, alleging that defendants negligently performed the May 1965 cutdown procedures. Plaintiff also has a claim for corporate negligence against Chestnut Hill Hospital. Thereafter, plaintiff filed an amended complaint on April 1, 2002, and a third amended complaint on September 18, 2003.[5] During discovery, plaintiff provided medical expert reports and supplemental reports from Drs. James A. Reiffel and Nicholas DePace. Dr. Watterson and Chestnut Hill separately filed motions for summary judgment on May 3, 2004. Dr. Padula filed his motion for summary judgment on May 4, 2004, and Dr. Matteucci filed his on May 21, 2004. This court granted all defendants' motions on July 14, 2004, because plaintiff's experts failed to opine to the requisite degree of medical certainty, and their reports were based on speculation and conjecture. Plaintiff, therefore, was unable to establish breach of the standard of care and causation.[6]

---

5. There is no evidence that plaintiff filed a second amended complaint.

6. Plaintiff's praecipe to discontinue her action as to defendants Drs. M. Brown, William O'Connell, B. Smith, M.S. Jayashekara

Plaintiff subsequently filed her petitions for reconsideration on July 26, 2004, which this court has denied. Plaintiff has since filed her notice of appeal to the orders granting summary judgment, and has issued her statement of matters according to Pa.R.A.P. 1925(b).

## III. LEGAL ANALYSIS

### *Issue*

(1) Whether the lower court committed an error of law and/or abuse of discretion in granting the defendants' motions for summary judgment for failure to establish defendants Drs. Watterson, Padula, and Matteucci, and Chestnut Hill Hospital breached the standard of care and causation?

Viewing the facts in light most favorable to plaintiff, Ann Stimmler, this court granted summary judgment for defendants, Chestnut Hill Hospital, Dr. Samuel Watterson, Dr. Walter Matteucci, and Dr. Padula. Plaintiff proffered original and supplemental expert reports from Drs. Reiffel and DePace. However, the experts' reports, taken as a whole, failed to establish, to a reasonable degree of medical certainty, that plaintiff's injuries were caused by a fragmented catheter left behind during the removal of catheters from cutdown procedures in May 1965. Plaintiff's experts' opinions were also based on conjecture and speculation. Thus, plaintiff has failed to establish that defendants breached the standard of care and causation.

---

Murthy, and Bangolor Surey was approved by this court on October 1, 2004.

To establish a cause of action in a medical malpractice claim, plaintiff has the burden of proving the following elements: (i) defendant owed a duty to the plaintiff, (ii) defendant breached that duty, (iii) that breach was the proximate cause of, or a substantial factor in, bringing about the harm suffered by plaintiff, and (iv) the damages plaintiff suffered were a direct result of the harm. *Kurian v. Anisman,* 851 A.2d 152, 156 (Pa. Super. 2004). Where the events and circumstances of a malpractice action are beyond the knowledge of the average layperson, plaintiff must present expert witness testimony, to a reasonable degree of medical certainty, that the acts of the medical practitioner deviated from the good and acceptable standards, and that such deviation was the proximate cause of the harm suffered. *Id.* at 155 (citing *Toogood v. Owen J. Rogal D.D.S.,* 573 Pa. 245, 255, 824 A.2d 1140, 1145 (2003)).

In order to prove a prima facie medical malpractice claim, plaintiff's expert must testify with "reasonable certainty" that "in his 'professional opinion, the result in question did come from the cause alleged.' " *Cohen v. Albert Einstein Medical Ctr.,* 405 Pa. Super. 392, 399, 592 A.2d 720, 723 (1991) (quoting *Kravinsky v. Glover,* 263 Pa. Super. 8, 396 A.2d 1349 (1979)). Although an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. *Childers v. Power Line Equipment Rentals Inc.,* 452 Pa. Super. 94, 110, 681 A.2d 201, 210 (1996). An expert fails this standard of certainty if she testifies "that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." *Niggel v. Sears, Roebuck & Co.,* 219

Pa. Super. 353, 355, 281 A.2d 718, 719 (1971) (see also, *Menarde v. Philadelphia Transportation Co.,* 376 Pa. 497, 103 A.2d 681 (1954); *Vorbnoff v. Mesta Machine Co.,* 286 Pa. 199, 133 A. 256 (1926); *Moyer v. Ford Motor Co.,* 205 Pa. Super. 384, 209 A.2d 43 (1965)).

In *Hoffman v. Brandywine Hospital,* 443 Pa. Super 245, 249, 661 A.2d 397, 399 (1995), decedent contracted HIV via blood transfusions administered during surgery. Decedent's executrix alleged that Dr. Eck, decedent's family physician, negligently treated decedent after she was diagnosed as HIV positive. *Id.* at 250, 661 A.2d at 399. To state her prima facie case, plaintiff relied on the expert report of David H. Solis D.O., who opined, in relevant part,

"To review, it is my opinion that Dr. Eck did not meet the standard of care for a family physician in the treatment of his patient, Helen Perpinka, from the time that she was discovered to be HTLV III (HIV) positive to the time that she was referred to an infectious disease specialist . . . . It is my opinion that because he chose not to refer Mrs. Perpinka to an infectious disease specialist that he undertook these awesome responsibilities on his own and he was ill-prepared to carry them out. *This, in all likelihood, delayed the administration of anti-viral medication which may have hastened the onset of opportunistic disease in Mrs. Perpinka and caused her illness to progress sooner than it might have."* Id. at 255, 661 A.2d at 402. (emphasis added)

The Superior Court affirmed the lower court's grant of summary judgment in favor of Dr. Eck. *Id.* at 256, 661 A.2d at 402. The Superior Court held that plaintiff's expert did not express the requisite degree of medical

certainty, and, therefore, has failed to state a prima facie case of medical malpractice. *Id.*

Here, similar to the expert in *Hoffman,* plaintiff's experts, in their original and supplemental reports, failed to opine to the requisite degree of medical certainty that the defendants caused plaintiff's injuries. In Dr. James A. Reiffel's April 4, 2004 expert report, he opined, in relevant part:

"Ms. Stimmler is certainly a patient who has undergone several hospitalizations and medical evaluations, many related to childbirth, phlebitis and/or pulmonary emboli or suspicion thereof, and others for possible infectious-related illness and for injuries. During the course of these hospitalizations, all but one of which were at Chestnut Hill Hospital, intravascular diagnostic studies and delivery of intravascular therapy were utilized (all being at Chestnut Hill Hospital), including bilateral arm cutdowns in May 1965, repeated venograms, and anesthesia/operative procedures. *Of these, the one in which there was the highest likelihood of a catheter being inserted which was long enough to account for the findings of the echocardiograms, and the ones, which for technical reasons, were the most likely to result in damage to such a catheter were the antecubital cutdowns in May of 1965.* Although no details are provided in the hospital records or the deposition material I received to allow a precise determination of how the catheter material came to embolize to the right heart and reside there chronically, that is, whether it was related to the insertion technique or the removal technique, with a high degree of medical certainty, I can state that while such complications of intravascular catheterization are recognized,

they are beyond the standard of care and virtually always represent negligence in the insertion, removal, and/or maintenance of the intravascular catheter. If additional procedural reports concerning the cutdown, catheter placement, catheter removal, venograms, and operative reports can be found in Ms. Stemmler's hospital records, I would like to see them for possible further clarification of the precise time and mechanism of the apparent catheter fragment embolization. They would not, however, alter the virtual certainty, that negligence was involved in the circumstance of catheter disruption and embolization that the echocardiographic findings appear to indicate." (emphasis added)

Dr. Reiffel conceded that plaintiff has undergone several hospitalizations and medical evaluations, and that during the course of these hospitalizations, intravascular diagnostic studies and delivery of intravascular therapy were utilized. Yet Dr. Reiffel opined that the hospitalization at Chestnut Hill in May 1965 was the one in which there was the "highest likelihood" of a catheter being inserted, which was long enough to account for the findings on the echocardiogram. Dr. Reiffel's opinion lacked the reasonable certainty necessary to establish that the May 1965 catheterizations were the cause the alleged foreign body.

In his May 26, 2004 supplemental expert report, Dr. Reiffel stated, "[W]ith a high degree of medical certainty, we can be sure that the catheter fragment in Ms. Stimmler's heart *must have* come from the catheters inserted" in one of the cutdowns at Chestnut Hill Hospital in May 1965. Dr. Reiffel further stated, "This must be true despite the absence of any notes, pro or con, in the records about any difficulty with the insertion or the re-

moval of the cutdown catheters." (*Id.* at 1.) This language does not meet the degree of certainty required by experts under Pennsylvania law. Dr. Reiffel's language manifested uncertainty as to whether one of the catheters placed in May 1965 was in fact the catheter which has remained in plaintiff's body.

Similarly, in Dr. DePace's August 4, 2003 expert report, he broadly stated,

"It is *apparent* that this intravascular catheter migrated into the heart when it became dislodged from a peripheral vein many years ago. This is a very rare finding and certainly would be the result of the negligent act of manipulation of the catheter or placement." (emphasis added)

Dr. DePace also submitted a supplemental report on May 27, 2004, where he simply adopted Dr. Reiffel's original opinion: "I concur with Dr. Reiffel that the antecubital cutdowns were the most likely source of her catheter migration." However, Dr. DePace's language manifested a lesser degree of certainty than that used by Dr. Reiffel. Dr. DePace's opinion, therefore, also failed to meet the requisite standard of medical certainty under Pennsylvania law.

Not only did Drs. Reiffel and DePace's reports fail to meet the requisite degree of certainty, their reports were based on speculation and conjecture. Under Pennsylvania law, expert testimony is incompetent and may not be admitted into evidence if the expert's opinion is based upon mere conjecture. *Hussey v. May Department Stores Inc.,* 238 Pa. Super. 431, 435, 357 A.2d 635, 637 (1976). An expert's opinion may be found conjectural because of the manner in which it is expressed. *Id.* An expert has

to testify that, in his professional opinion, plaintiff's injuries came from the cause alleged. A less direct expression of opinion falls below the required standard of proof, and does not constitute legally competent evidence. *Id.* Also, an expert's opinion may be found conjectural because it does not have an adequate basis in fact. *Id.* An expert's opinion may be based upon personal examination, upon assumed truth of testimony of other witnesses adduced in court, or upon combination of these two sources. *Id.*

An expert cannot base his opinion upon facts which are not warranted by the record. *Collins v. Hand,* 431 Pa. 378, 390, 246 A.2d 398, 404 (1968). No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based upon mere conjecture. *Id.* In *Collins,* the Pennsylvania Supreme Court adopted the rationale that:

"It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. The opinion must be an intelligent and reasonable conclusion, based on a given state of facts, and be such as reason and experience have shown to be a probable resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. *In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion." Id.* (citing *Dreher v. Order of United Commercial Travelers of America,* 173 Wis. 173, 180 N.W. 815 (1921)).

In *Collins,* the court held that the lower court erred in refusing to grant appellant-doctor's motion for a judgment n.o.v., because the evidence failed to establish that the psychiatrist's failure to take or read x-rays to determine that the patient suffered bilateral acetabular fractures, or that physicians' electroshock treatment was the cause of such fractures. 431 Pa. at 395-96, 246 A.2d at 407. The only proof of negligence on the part of the shock team was Dr. van der Meer's opinion that too much restraint to Ms. Collins' legs was improper medical practice. *Id.* at 391, 246 A.2d at 404. An examination of the record did not disclose any evidence that Ms. Collins' legs were restrained during the course of electroshock treatment. *Id.* Dr. van der Meer's opinion assumed (1) that restraints were applied to Ms. Collins' legs, and (2) that this restraint was too much. *Id.* The court stated that based on the record, this testimony can only be classified as mere guess or conjecture and "would be to build a presumption on a presumption, which would build a smoke ladder into the skies of irresponsible speculation, which, fortunately, the law prohibits." *Id.* (citing *Auerbach v. Philadelphia Transportation Co.,* 421 Pa. 594, 602, 221 A.2d 163, 170 (1966)). The court held that Dr. van der Meer's opinion was error and issued a new trial. *Id.* at 395-96, 246 A.2d at 407.

Here, Drs. Reiffel and DePace's opinions lacked evidence supporting their conclusion that the May 1965 catheterizations, and not the 16 others (Dr. Padula's request for admissions, dated 3/24/03), were the sole cause of her respiratory and circulatory problems. Dr. Reiffel admitted that he lacked any evidentiary support as the basis of his opinion. Dr. Reiffel stated, "[A]lthough no details are provided in the hospital records or the depo-

sition material I received to allow a precise determination of how the catheter material came to embolize to the right heart and reside there chronically." (Expert report, dated 4/4/04, p. 2.) Yet, Dr. Reiffel still opined that there had to be negligence either in the insertion, removal, and/or maintenance of the intravascular catheter. Similarly, it is not clear what, if any, prior medical records Dr. DePace in fact reviewed prior to reaching his conclusion. Dr. DePace makes no reference to reviewing any medical records and/or deposition testimony which would support his conclusions. Thus, as in *Collins,* Drs. Reiffel and DePace's expert reports were based on speculation which cannot establish the standard of care and causation elements required to maintain this cause of action.

Admission of expert opinion evidence is a matter within the sound discretion of the trial court. *Hussey,* 238 Pa. Super. at 435, 357 A.2d at 637. The court determines all questions of law, while the jury passes on the credibility of witnesses and determines the facts. *Williams v. Dulaney,* 331 Pa. Super. 373, 379, 480 A.2d 1080, 1084 (1984). The jury, however, cannot reach a verdict based on speculation or conjecture. *Id.* Prior to sending the case to the jury, the trial court has the duty to determine whether the plaintiff has introduced sufficient evidence to establish the requisite elements to maintain an action. *Id.* at 379-80, 480 A.2d at 1084.

According to Rule 1035.2 of the Pennsylvania Rules of Civil Procedure, which governs motions for summary judgment,

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party

may move for summary judgment in whole or part as a matter of law:

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of experts reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense, which in a jury trial would require the issues to be submitted to a jury."

The moving party has the burden of demonstrating that no genuine issue of material fact exists. *Penn Center House Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989). All doubts in the record must be viewed in the light most favorable to the non-moving party. *Id.* at 176, 553 A.2d at 903. The movant can only discharge his burden by showing that his/her opponent could produce no competent evidence to support a contrary position. *Community Medical Services of Clearfield Inc. v. Local 2665,* 292 Pa. Super. 238, 437 A.2d 23 (1981).

Here, neither of plaintiff's experts set forth in their respective reports the required degree of medical certainty on causation for them to be submitted to the jury. Additionally, the experts' reports were based on speculation and conjecture. Based on the expert reports, plaintiff would not have been able to prove to a reasonable degree of medical certainty that the foreign object currently found in the plaintiff's heart definitively related to the Chestnut Hill hospitalization. Defendants, therefore, were entitled to summary judgment as a matter of law.

## IV. CONCLUSION

In consideration of the analysis set forth above, this court believes that the defendants' motions for summary judgment were properly granted, and should be affirmed by the court above.