DISSENTING OPINION BY
JUDGE McCullough
I respectfully dissent from the thoughtful Majority because I do not agree that Objectors’ testimony and documentation “was the kind of speculative evidence insufficient to constitute proof of detriment to health, safety, and welfare exceeding those ordinarily to be. expected from the proposed use.” (Maj. op. at 563.)[1]
*565 Initially, I note that on a conceptual level, where, as here, an applicant seeks a conditional use and proposes to install novel infrastructure within a municipality’s borders, it is relatively difficult for the objectors to demonstrate that the infrastructure will have a negative impact on the health, safety, welfare, or environment of the community. Oftentimes, the objectors testify that they have a generalized “fear” or “concern,” without any supporting factual basis, that the proposed infrastructure will result in some type of harm. The primary reason for this is that the new infrastructure is not yet in place and the objectors have not had the opportunity to perceive or experience its effects firsthand, and, as a result, they are reduced to testifying only as to the sheer possibility of a negative consequence. This Court has consistently concluded that such testimony constitutes mere speculation and is insufficient to satisfy .the objectors’ burden of proof. See, e.g., JoJo Oil Company, Inc. v. Dingman Township Zoning Hearing Board, 77 A.3d 679, 689 (Pa. Cmwlth. 2013) (“Objectors’ witnesses testified generally about the possibility of an explosion and their concerns about living in proximity of the facility. There was no evidence of prior problems with such facilities.”).
But this case is clearly distinguishable from JoJo Oil Company, Inc. Objectors’ evidence in this case is of a different pedigree altogether. Objectors are not merely expressing “concerns” or “fears” of abstract possibilities in a realm of conjecture. To the contrary, Objectors’ evidence is specific and concrete and they have established, through comparative evidence, that a substantially similar natural gas production facility owned and operated by EQT— the “Trax Farm Well Site”—has had a detrimental effect on Union Township, a neighboring municipality. As the Council found as fact:
1. The proposed [Bickerton Well Site] is approximately 126 acres and will include unconventional wells both at the vertical and horizontal laterals and be hydraulically fractured. [EQT] testified that the proposed wells would likely descend, six thousand to seven thousand (6,000-7,000) feet vertically before being turned horizontal outward up to ten thousand (10,000) feet.
[[Image here]]
7. Exhibit C evidences the presence of wetlands and unnamed tributaries to Peters Creek very near the vicinity of the 126 acre proposed well site.
‡ $ ⅜
22. The following persons, after being duly sworn, testified at the November 10, 2015 public meeting:
[[Image here]]
b. Bob Dorman—Union Township: Commented on “gag agreements” EQT offered residents hear the EQT Trax Farm well site wherein residents would grant an easement/right-of-way over and above their properties to EQT for noise, dust, light, smoke, odors, fumes, soot or other pollution, vibrations, adverse impacts or other conditions or nuisances which may emanate from EQT’s operations; provided. [Council] with copies of such agreements; [and] noted the proximity of neighborhoods to the proposed Bick-ertori well site and . how many of them would be within the half mile safety radius [EQT] discussed ....
c. Gary Baumgartner—Union Township: Provided [Council] with an exhibit demonstrating his home’s geographic relationship to the EQT Trax Farm well site[;] commented' on the life-disrupting levels of vibration coming from the Trax Farm well site which he alleges cause sleep deprivation and visible shaking of household items; dis *566 cussed odors such as diesel fumes and sulfur coming from the well site; commented upon advice given to him by the Southwestern Regional Health Association regarding the presence of airborne particulate matter emanating from the hydraulic fracturing operation and settling on nearby properties restricting outdoor activities such as lawn mowing, gardening, and playing in grass; alleged air quality levels and diesel odors requiring evacuation of his home; stated that issues with noise, air quality, and odors forced his pregnant daughter to move out [of the house] at the recommendation of her doctor and that he and his wife also had to move out countless times; [and] alleged a respiratory illness requiring hospitalization was due to issues from the Trax Farm well site ....
d. Mickey Gniadek—Union Township: [Testified about a December 4, 2013 incident where he went outside of his house near the Trax Farm well site, witnessed a thick white cloud about three-and-half feet off the ground, [and] smelled an acidic and then chlorine-like smell; stated that after this incident he had red dots over his entire body and was later told his symptoms were one of the signs of asphyxiation; [and] recounted that after this incident an EQT subcontractor arrived at his house to offer him $50,000.00 as part of an offer that was being made to the people in his neighborhood, which first required everyone to sign on and was later changed to allow each neighbor to decide individually ....
e. Andy Tullai—Jefferson Hills, Pennsylvania: Recently moved from near Trax Farm well site to Jefferson Hills; testified about low frequency sounds that would come from the Trax Farm well site and cause loss of sleep; [and] commented on the annoyance of diesel fumes ....
[[Image here]]
h. Judith Kaufmann—Jefferson Hills, Pennsylvania: Family nurse practitioner, holds a doctorate in public health, wanted to testify based on her professional roles and Borough resident status[;] stated that the American Academy of Pediatrics had recently released a consensus statement warning people and urging them to not move forward with fracturing until health data can be reviewed due to the apparent ability of fracturing related toxins to cross the placenta during pregnancy and contaminate cord blood, amniotic fluid, and breast milk in addition to the placenta; [and] noted that fracturing chemicals such as benzene, ethylene and formaldehyde can cause cancer and in the case of ethylene, it is also considered a neurotoxin ....
(Council’s F.F. Nos. 1, 7, 22b-e, h) (citation omitted).
In its brief, the Borough explains: “Because there is presently no unconventional oil and gas development within the Borough, the focus of [Objectors’] evidence was associated with EQT’s existing [Trax Farm] unconventional well site in Union Township, Washington County, that was similar to what was proposed in the [Borough].” (Borough’s brief at 18.)[2]
Previously, this Court reaffirmed that while an objector’s “bald assertions, personal opinions and speculation will not” suffice to prove detrimental impact on a community, “[t]estimony based on specific past experiences can satisfy this burden .... ” Servants Oasis v. Zoning Hearing Board of South Annville Township, 94 A.3d 457, 465 (Pa. Cmwlth. 2014) (citing *567 Visionquest National, Ltd. v. Board of Supervisors of Honey Brook Township, Chester County, 524 Pa. 107, 569 A.2d 915, 917-18 (1990)).
Citing case law from this Court, our Supreme Court in Visionquest stated that “testimony as to prior experiences with the specific proposed use, while the use was conducted unapproved or unlawfully, should be given greater weight in determining the detriment to the community as such testimony is clearly not speculative.” Id. at 918 (citing Tuckfelt v. Zoning Board of Adjustment of the City of Pittsburgh, 80 Pa.Cmwlth. 496, 471 A.2d 1311 (1984); Atlantic Richfield Company v. City of Franklin Zoning Hearing Board, 77 Pa. Cmwlth. 102, 465 A.2d 98 (1983); Hannon v. Zoning Board of Wilkes-Barre, 32 Pa. Cmwlth. 356, 379 A.2d 641 (1977)).[3]
Although the Supreme Court in Vision-quest pointed to incidents occurring at another facility operated by the applicant to bolster the objectors’ testimony, it appears that neither the Supreme Court nor this Court has ever determined whether the rule announced in Visionquest applies in the situation where the objectors’ testimony is based solely upon the effects they experienced at a substantially similar facility located in an adjoining municipality. Nevertheless, logic and fundamental fairness dictate that such an extension should be made, at least in the context of this case, where there is no unconventional gas well located within the Borough upon which to compare generally or analyze when it is operated unlawfully/unapproved and prior to an application for a special exception. After all, “specific past experiences,” Visionquest, 569 A.2d at 918, are no less meaningful simply because they occurred elsewhere and the inquiry should naturally and predominately focus on what it is that caused those experiences. This is especially true considering that within the rationale of Visionquest is the unstated presupposition that what has happened (or *568 more appropriately, “experienced”) in the past is competent evidence of what will continue to happen in the future.
Moreover, this extension , of the Vision-quest rule is an extremely modest-one that has a strong foundation in other areas of the law. In point of fact, evidence of a substantially similar accident or harmful consequence is admissible, in civil law cases to prove that an instrumentality or condition is defective or dangerous, see Blumer v. Ford Motor Co., 20 A.3d 1222, 1227-31 (Pa. Super. 2011),[4] and evidence of a substantially similar property is admissible in tax assessment cases to prove another property’s fair market value, see Aetna Life Insurance Co. v. Montgomery County Board of Assessment Appeals, 111 A.3d 267, 278-81 (Pa. Cmwlth. 2015).[5] The overriding and underlying thrust of these cases is that when two objects are demonstrated to be like in kind, proof of how an object performed, operated, and/or functioned in a certain circumstance tends to prove how the object will perform, operate, and/or function in a remarkably similar circumstance.
-Notably, Objectors’ testimony is based on their first-hand observations and experiences at the Trax Farm Well Site and is by no means “speculative” in that sense of the legal term. See Gibson v. Workers’ Compensation Appeal Board (Armco Stainless & Alloy Products), 580 Pa. 470, 861 A.2d 938, 944 (2004) (stating that the Pennsylvania rule of evidence pertaining to lay person testimony “contemplates admission of lay opinions rationally based on personal knowledge that are helpful to the trier of fact. At common law, witnesses not qualifying as experts were generally permitted to testify regarding those things that they had seen, heard, felt, tasted, smelled, or done.”) ’ (citation and internal brackets and quotations omitted). Objectors’ testimony is also buttressed by medical information that Objectors referenced and relayed at the hearing, and EQT does not take issue with the admission of this information or the Council’s findings of fact crediting it. This testimony, I believe, constitutes substantial evidence to support the Council’s finding that the grant of the conditional use will have a detrimental impact on the community
The Majority’s conclusion requiring Objectors “to present either lay or expert testimony specific to the Bickerton Well Site,” (Maj. op. at 163), is unduly restrictive and impracticable, has the effect of placing upon Objectors an almost insurmountable burden, of proving detrimental harm, and threatens “the ‘inherent and *569 indefeasible’ right of our citizens to possess and protect property.” PA Northwestern Distributors, Inc. v. Zoning Hearing Board of Moon Township, 526 Pa. 186, 584 A.2d 1372, 1375 (1991) (citing and quoting Article 1, Section 1 of the Pennsylvania Constitution, Pa. Const. art. I, § 1); see also Cleaver v. Board of Adjustment of Tredyffrin Township, 414 Pa. 367, 200 A.2d 408, 413 (1964). To be sure, even if Objectors had hired an expert, the expert most likely would have had to rely on comparative data from other well sites to support his/her opinion regarding the Bickerton Well Site. See Collins v. Hand, 431 Pa. 378, 246 A.2d 398, 404 (1968) (discussing foundational requirement for the admissibility of expert testimony). Significantly, EQT had the opportunity to rebut Objectors’ testimony that the vibrations, “clouds,” and “fumes” from the Trax Farm Well Site caused illness and sleep deprivation. EQT also had the chance to offer evidence that these incidents never occurred or explain how they were the result of negligent mistakes that have been later identified and corrected or mere events of unforeseeable circumstances. EQT did not do so.
Contrary to the Majority, I would conclude that Objectors’ testimony is not speculative or incompetent as a matter of law, but, instead, is admissible evidence capable of being assessed for the worth that the fact-finder decides to provide it. In its role as the ultimate fact-finder, see In re Thompson, 896 A.2d 659, 668-69 (Pa. Cmwlth. 2006), the Council in this case determined that Objectors’ testimony was credible and persuasive, afforded significant weight to the testimony, and found as fact that the grant of the conditional use would not protect the health, safety, and welfare of Borough as required by the Ordinance. (Council’s F.F. No. 22; COL at B, G.) In particularized detail, Objectors testified how the Trax Farm Well Site released harmful chemicals that have had an adverse effect on the residents (or then residents) of Union Township, most notably their physical and mental health. From this evidence, it was within the exclusive province of the Council, as the fact-finder, to draw the inference that it is likely that the same effects will happen to the Borough’s residents with the Bickerton Well Site. That is just what the Council sought to do here when it considered what had happened at the Trax Farm Well Site and denied EQT a special exception in the name of protecting “the public health, safety, [and] welfare” of the Borough. (Ordinance, § 1008(a).)
Accordingly, I would conclude that Objectors’ evidence was sufficient to satisfy their burden of proof and that EQT failed to persuade the Council that the Bickerton Well Site would not have negative impact on the Borough. Hence, I respectfully dissent.

. Pursuant to the Ordinance of the Borough of Jefferson Hills (Borough), as implemented and modified by our decision in Bray v. Zoning Board of Adjustment, 48 Pa.Cmwlth. 523, 410 A.2d 909, 911-12 (1980), Objectors, had the initial burden of adducing sufficient evidence establishing that, in all likelihood, the use will "endanger the public health, safety or welfare [or] deteriorate the environment, as a result of being located on the property where it is proposed.” (Ordinance, § 1003(a).) See Manor Healthcare v. Zoning Hearing Board, 139 Pa.Cmwlth. 206, 590 A.2d 65, 71 (1991) (discussing the burden of proofs under Bray: "[T]he Zoning Ordinance may, as here, place the 'burden of proof' on the applicant as to the matter of detriment to health, safety and general welfare, Such a provision in the Zoning Ordinance, however, merely places the persuasion burden on the applicant. The objectors still retain the initial presentation burden with respect to the general matter of the detriment to health, safety and general welfare.”).
Distilled to its essence, the only issue in this appeal is whether Objectors satisfied this burden because the Borough Council of the Borough of Jefferson Hills (Council) determined that EQT failed to persuasively demonstrate that operation of the Bickerton Well Site would not result in a detrimental impact. Council's Findings of Fact (F.F.) Nos. 25, 27; Conclusion of Law (COL) at GG. Because the Council made the necessary findings of facts, any error that it committed in applying the burden-shifting framework of Bray was a harmless one. See Appeal of R.C. Maxwell Co., 120 Pa.Cmwlth. 251, 548 A.2d 1300, 1303-05 (1988).

. EQT admits that this statement is accurate. (EQT's brief at 32 n.12.)

. In Tuckfelt, the applicants sought an occupancy permit or special exception to rent the third floor of a building to two individuals. Based on the testimony of nearby landowners concerning their past experiences with the individuals when residing in the building, the trial court found as fact that "the additional roomers added more noise to the neighborhood by playing their own stereo systems, created additional parking problems since there were no on site parking spaces available, added to the trash and litter found on the property, and inhibited their neighbor’s enjoyment of their surrounding properties by having loud parties that generated litter which was on occasion cleaned up by neighboring residents.” 471 A.2d at 1314-15. Because this finding was supported by substantial evidence, and the landowners’ testimony was not speculative, this Court concluded that there was evidence sufficient to establish an adverse effect on the health and safety of the community. See Hannon, 379 A.2d at 461-62 (concluding that the neighbors’ testimony concerning adverse effects of a rooming house while it was operating illegally and without proper licensure warranted the denial of the applicant’s request for special exception to operate a rooming house and rejecting the applicant’s argument that the zoning board "erred in considering past events at his rooming house”).
Similarly, in Atlantic Richfield, the applicant requested a special exception to convert an existing gasoline station to a mini-market with self-service gasoline pumps. In opposition, several residents who resided close to the gasoline station testified as to the adverse effects of the unconverted gasoline station, including loud noise, littering, and loitering. This Court stated: ”[I]t is clear that this is not a case where the objectors offered unfounded presuppositions as proof. It was on the basis of their prior experiences with the twenty-four hour operation of the unconverted gas station that they attempted to prove the adverse effects of the proposed conversion of the gasoline service station.” 465 A.2d at 100. Therefore, we concluded that the zoning board did not err in determining that the proposed conversion would constitute a detriment to the public health, safety, or welfare of the community.

. In Blumer, the plaintiff alleged that a defective design of a parking brake caused the brake to disengage, resulting in a truck rolling down a hill and killing an individual, and asserted a strict product liability claim under a malfunction theory. The Superior’ Court explained that “[e]vidence of prior accidents involving the same instrumentality is generally relevant to show that a defect or dangerous ' condition existed,” id. at 1228, and concluded that twenty-five reports of prior, similar incidents from other consumers was admissible to prove that the truck's parking brake mechanism was defective.

. In Aetna Life, this Court noted that the comparable sales approach is one of the methods to determine a property’s fair market value for tax assessment purposes. We reiterated: "[I]n determining market value, 'com-parables’ means properties of a similar nature which have been recently sold. In order to be comparable ... however, the properties need not be identical .... Thus, comparisons based on sales may be made according to location, age and condition of improvements, income and expense, use, size, type of construction and in numerous other ways.” Id. at 279 (citation omitted). Ultimately, in Aetna Life, this Court concluded that the trial court did not err in assessing a property’s fair market value based, in large part, on the values of the other, comparable properties.